# 24-1169-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

DR. EDGARD EL CHAAR,

*Plaintiff-Appellant,*

— v. —

NEW YORK UNIVERSITY COLLEGE OF DENTISTRY,

*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

DAVID BOIES
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200

MICHAEL J. PASSARELLA
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

*Attorneys for Plaintiff-Appellant*



COUNSEL PRESS    (800) 4-APPEAL • (331398)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

I.    JURISDICTIONAL STATEMENT ............................................... 1

II.   ISSUES FOR REVIEW ................................................................. 1

III.  STATEMENT OF THE CASE ...................................................... 2

IV.   STATEMENT OF FACTS .............................................................. 3

    A.    Dr. El Chaar Suffers from a Hostile Work
           Environment Throughout his Employment at NYU ............................ 3

    B.    2018: NYU's Office of Equal Opportunity ("OEO") Finds
           that Dr. El Chaar Suffered from a Hostile Work Environment ........... 6

    C.    2018-2019: Dr. El Chaar Suffers Retaliation for his Prior
           Complaints, NYU Inexplicably Fails to Investigate When Dr.
           El Chaar Complains of Retaliation ..................................................... 9

    D.    2019-2020: Dr. El Chaar Continues to Suffer Harassment,
           NYU Fails to Investigate When Dr. El Chaar Complains
           Again of Discrimination .................................................................... 11

    E.    2020: NYU's Dean Again Admits that he Retaliated Against
           Dr. El Chaar in a Promotion Decision ............................................... 13

    F.    2021: NYU Again Retaliated Against Dr. El Chaar,
           Culminating in Dr. El Chaar's Constructive Discharge ..................... 14

V.    STANDARD OF REVIEW ............................................................. 17

VI.   SUMMARY OF THE ARGUMENT .............................................. 17

VII.  ARGUMENT .................................................................................. 19

    A.    Standard for Retaliation Under 1981 ................................................ 19

    B.    A Reasonable Jury Could Find That Appellee Retaliated
           Against Appellant in Failing to Appoint Him as Interim Chair ......... 22

    C.    A Reasonable Jury Could Find That Appellee Retaliated
           Against Appellant in Failing to Appoint Him as Permanent
           Chair .................................................................................................. 28

i

D.  Standard for Hostile Work Environment Under 1981 ........................34

E.  The District Court Should Have Considered The Complete History of Dr. El Chaar's Discrimination and Hostile Work Environment ...................................................................................35

F.  A Reasonable Jury Could Have Found That Dr. El Chaar Suffered Discrimination and a Hostile Work Environment................39

VIII. CONCLUSION............................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abreu v. Suffolk Cnty. Police Dep't,*
No. 03-CV-5927, 2007 WL 608331 (E.D.N.Y. Feb. 23, 2007)...........................25

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ......................................................................17

*Banks v. Gen. Motors, LLC,*
81 F.4th 242 (2d Cir. 2023) ................................................ 21, 34, 40

*Bostock v. Clayton Cnty., Ga.,*
140 S. Ct. 1731 (2020)..................................................................21

*Cadet v. All. Nursing Staff of New York, Inc.,*
632 F. Supp. 3d 202 (S.D.N.Y. 2022) ...............................................20

*Cardwell v. Davis Polk & Wardwell LLP,*
No. 1:19-cv-10256, 2023 WL 2049800 (S.D.N.Y. Feb. 16, 2023).............. 20, 24

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ......................................................................17

*Cornwell v. Robinson,*
23 F.3d 694 (2d Cir. 1994) ..............................................................35

*Davis-Garett v. Urb. Outfitters, Inc.,*
921 F.3d 30 (2d Cir. 2019) .................................................. 17, 27, 28

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7,*
691 F.3d 134 (2d Cir. 2012) ............................................................28

*Fagan v. U.S. Carpet Installation, Inc.,*
770 F. Supp. 2d 490 (E.D.N.Y.2011)..................................................20

*Fincher v. Depository Tr. & Clearing Corp.,*
604 F.3d 712 (2d Cir. 2010) ...................................................... 24, 25

*Fitzgerald v. Henderson,*
251 F.3d 345 (2d Cir. 2001) ........................................ 35, 37, 38, 40

*Fleming v. MaxMara USA, Inc.,*
371 F. App'x 115 (2d Cir. Mar. 25, 2010) ...........................................22

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) ........................................................... 19-20

*Kaytor v. Elec. Boat Corp.*,
  609 F.3d 537 (2d Cir. 2010) ...............................................................40

*Kwan v. Andalex Grp., LLC*,
  737 F.3d 834 (2d Cir. 2013) ................................................. 20, 21, 32

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002*)* ..................................................................... 34-35

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
  875 F.3d 107 (2d Cir. 2017) ................................................................17

*Rasmy v. Marriott Int'l, Inc.*,
  952 F.3d 379 (2d Cir. 2020) ................................................... 25, 26

*Richardson v. Comm'n on Human Rights & Opportunities*,
  532 F.3d 114 (2d Cir. 2008) ...............................................................22

*Saji v. Nassau Univ. Med. Ctr.*,
  724 F. App'x 11 (2d Cir. 2018) ...........................................................20

*United States v. New York City Dep't of Educ.*,
  407 F. Supp. 3d 365 (S.D.N.Y. 2018) ................................................33

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1) ...........................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1367(a) ................................................................................1

42 U.S.C. § 1981 ......................................................................... *passim*

Fed. R. Civ. P. 56(a) .............................................................................17

New York City Administrative Code § 8-101 .........................................2

New York State Executive Law § 296 ....................................................2

## I.  JURISDICTIONAL STATEMENT

This is an appeal from a final Judgment, entered on March 29, 2024, in favor of Defendant-Appellee New York University ("NYU"), granting Defendant's motion for summary judgment to dismiss the Complaint. SPA-26. The Judgement was made upon the District Court's Order dated March 28, 2024. SPA-1. Jurisdiction below was based on 28 U.S.C. § 1331. The District Court had jurisdiction because one or more of the Plaintiff's claims arises under "the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. The District Court had supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367(a).

Plaintiff timely filed a Notice of Appeal on April 26, 2024. A-2289. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.  ISSUES FOR REVIEW

1.  Did the District Court err in dismissing Appellant's claim for retaliation under 42 U.S.C. § 1981 because, based on the record, a rational jury could find that Plaintiff suffered retaliation for complaining about discrimination based on his race and ethnicity?

2.  Did the District Court err in dismissing Appellant's claim for hostile work environment under 42 U.S.C. § 1981 because Appellant was a

1

victim of discrimination and pre-October 2017 acts should have been

considered as a continuing violation.

## III. STATEMENT OF THE CASE

On October 6, 2021, Plaintiff commenced this action by filing a Summons in

the New York State Supreme Court, New York County. A-9. On January 14, 2022,

Plaintiff filed his complaint (the "Complaint"), alleging employment

discrimination based on national origin and race/ethnicity and retaliation, each in

violation of New York State Human Rights Law, New York State Executive Law §

296 et seq.; New York City Human Rights Law, New York City Administrative

Code § 8-101 et seq.; and 42 U.S.C. § 1981. A-112.

On February 1, 2022, before answering the complaint, Defendant filed a

notice of removal to the United States District Court for the Southern District of

New York (the "Southern District"). A-9. After extensive discovery, Defendant

filed a motion for summary judgment with the Southern District on June 20, 2023.

A-97. On March 29, 2024, the District Court granted Defendant's motion for

summary judgment as to Plaintiff's federal claims. A-2315.

The District Court declined supplemental jurisdiction over Plaintiffs'

NYCHRL and NYSHRL claims. A-2313-14. The parties have stipulated that the

state and local claims are stayed pending the outcome of this appeal, and if the

Court grants any part of Appellant's appeal the parties will jointly request that the

District Court exercise pendent jurisdiction over the state and local claims.

## IV.     STATEMENT OF FACTS

### A.     Dr. El Chaar Suffers from a Hostile Work Environment Throughout his Employment at NYU

Dr. El Chaar immigrated to the United States from Lebanon in 1993 after

graduating from dental school.  A-144-45,12:23-13:7.  He began studying at NYU

in 1993 and was employed at NYU from 1995 to 2012. A-145-46, 13:4-14:10; A-

150, 18:2-18; A-1298.  NYU faculty made racist remarks about Dr. El Chaar as

soon as he arrived at the University in 1993.  A-207-08, 75:7-76:16; A-1362.  Dr.

Bruce Davidson regularly called Dr. El Chaar a "camel jockey" for decades.   A-

207-08, 75:7-76:4; A-1364.  Other faculty members would call him a terrorist, or

baselessly accuse him of being anti-Semitic because they viewed him as an

"Arab."  A-160-61, 28:6-29:17; A-164, 32:9-14; A-208, 76:5-16.  Dr. El Chaar is

proud of his Lebanese heritage, but believed his colleagues harassed him because

of negative stereotypes stemming from terrorist attacks in Lebanon in the 1990s

and a stereotype that all "Arabs" are anti-Semitic. A-160, 28:14-22; A-161, 29:18-

20; A-208, 76:5-16; A-1880 (email describing Dr. El Chaar as "A man from a

country that hates Isreal [sic]").  Dr. El Chaar accepted this abuse for many years

because he was "fresh off the boat," wanted to be accepted, and had no one to go

to.  A-208, 76:16-20.

3

The racist harassment intensified in 2001 after Dr. El Chaar had a business dispute with a friend of Dr. Schoor, who was the beloved Program Director of the Postgraduate Program until 2013. A-153, 21:23-25; A-154-55, 22:11-23:8; A-167, 35:7-20; A-482, 73:22-25. During an argument with Dr. El Chaar, Dr. Schoor shouted, "you are a dirty Arab and you don't deserve to be between us," accusing Dr. El Chaar of coming between Jewish faculty. A-156, 24:14-25; A-157, 25:2-12; A-162, 30:3-10. Dr. Schoor regularly called Dr. El Chaar a terrorist and told people to stay away from him. A-164, 32:9-14. But Dr. Schoor was influential in the field and had a large group of supporters at NYU. A-175, 43:4-14. After their fight, Dr. Schoor's supporters began harassing Dr. El Chaar because of his ethnicity and national origin. A-177, 45:5-11. On a flight to a ski trip in March 2001, Dr. Brian Chadroff told Dr. El Chaar's roommate for the trip to be careful with him because "he's a terrorist." A-162-64, 30:11-32:4. The man then refused to room with Dr. El Chaar, who left the trip early. *Id*. As the situation with Dr. Schoor and his supporters worsened, Dr. El Chaar finally reported the racist harassment to Stuart Hirsch, who told him, "just brush it off, it's not important, you're bigger than them." A-164-65, 32:19-33:6. This would be the first of many times that NYU administration downplayed the racist hostility directed at Dr. El Chaar by NYU faculty.

4

Dr. El Chaar briefly left NYU in 2012, but returned in 2013 as Program Director. Dr. El Chaar was excited and optimistic to take on this new role at NYU (A-1839), but unfortunately faced the same racism upon returning. A-219, 87:20-23. Many of Dr. Schoor's supporters had favored Dr. Roger Warren to replace Dr. Schoor as Program Director and lashed out at Dr. El Chaar as a result. A-188, 56:8-14. He commonly heard jokes about "Jews and Arabs" because of his national origin. A-219, 87:20-23. Dr. Bruce Davidson—who had for decades regularly referred to Dr. El Chaar as "camel jockey"—bet Dr. El Chaar 50 cents that he would not last a year as Program Director. A-209, 77:4-16; A-221, 89:2-15; A-1398. Dr. Davidson apologized to Dr. El Chaar for this comment, but then avoided Dr. El Chaar and barely spoke to him when they saw each other. A-222-23, 90:20-91:8; A-1398. Dr. El Chaar reported this abuse to Dr. Loomer, who again downplayed the racist harassment and told Dr. El Chaar to "just ignore them and keep doing what you're doing." A-221, 89:20-22. Dr. Warren accused Dr. El Chaar of being anti-Semitic and firing Jewish faculty. A-229-30, 97:2-98:6. In 2016, an employee from the international program called Dr. El Chaar and informed him that Dr. Warren was referring to him as "Hitler" because he as "getting rid of the Jewish faculty" and told people he had a plaque in his office that said "Fuhrer." A-247, 115:8-24.

5

Despite this abuse, Dr. El Chaar succeeded in improving the program. A-219, 87:17-18; A-1854; A-1020, 36:5-25. Dr. Andrea Schreiber testified that there was student dissatisfaction before Dr. El Chaar took over as Program Director, but that things improved when he took over and that if he left there would be no heir apparent to replace him. A-1020, 36:5-25; A-1854.

Dr. El Chaar spoke about this racist harassment with various administrators, including Dr. Loomer, Chair of the Periodontology Department, Dr. Schreiber, Senior Associate Dean for Academic Affairs, and Julia Murphy, the College's head of HR, many times over the years, but they all downplayed the abuse he experienced and did nothing to address it. A-221, 89:20-22; A-688-89, 50:14-51:7; A-291, 159:3-20; A-1035-36, 51:2-52:7; A-262-63; A-699, 61:2-22.

### B. 2018: NYU's Office of Equal Opportunity ("OEO") Finds that Dr. El Chaar Suffered from a Hostile Work Environment

Finally, after years of racist and ethnic harassment, Dr. El Chaar filed a complaint with the Office of Equal Opportunity ("OEO") in August 2017. A-270, 138:10-17; A-898, 30:21-25; A-1449-51. NYU's Office of General Counsel, to whom the OEO reported, updated the University's Non-Discrimination and Anti-Harassment Policy and Complaint Procedure for Employees through the years to track changes to various laws, including Title VII, the New York State Human Rights Law, and the NYCHRL. A-1119, 30:15-20; A-1121. After a thorough investigation and interviews, the OEO issued a report and determination on Dr. El

6

Chaar's complaints (the "OEO Report"), finding, "[w]hile the Policy is not intended to serve as a general civility code, the complained-of conduct by multiple faculty members, particularly in the presence of NYU students, is sufficient to create an 'intimidating, hostile or offensive working environment' or otherwise 'interfere[] with an employee's work performance.'…Accordingly, there is evidence to support Complainant's collective allegations of a hostile work environment." A-1457; *see also* A-1119, 30:4-9; A-822, 39:17-22. The OEO Report did not find that Dr. El Chaar contributed to the hostile work environment and the authors of the OEO Report testified that he did not contribute to the hostile work environment. A-1136-37, 47:10-48:16; A-514,105:2-5.

Dean Bertolami and NYU Human Resources were responsible for addressing the results of the OEO Report. A-1114, 25:7-16. Dean Bertolami acknowledged the findings of the OEO Report and even testified that "it was certainly true that those were really inexcusable and credible allegations that Dr. El Chaar made against those specific faculty" (A-515-16, 106:23-107:8), but blamed Dr. El Chaar for the hostile work environment he had experienced, believing "it was clear that El Chaar was contributing his share to the hostile work environment." A-512-13, 103:21-104:5, A-2004, 19:17-21. Dean Bertolami thought Dr. El Chaar was an "extremely divisive individual" who should have "overcome" the hostile work environment "with a desire to advance his career so

7

that he was not the focus of antagonism." A-514-15,105:22-106:5; A-552-53,143:11-144:3. As was the case at many junctures in Dr. El Chaar's career at NYU, Dean Bertolami believed it was Dr. El Chaar's responsibility to move on from the racist harassment he experienced. *See, e.g.*, A-164-65, 32:19-33:6; A-221, 89:20-22; A-248-49,116:23-117:12; A-291, 159:3-20; A-1035-36, 51:2-52:7.

The Department's only response to the OEO's finding of a hostile work environment was a generic training that was not tailored to the racist harassment experienced by Dr. El Chaar. A-1904; A-1939; A-1115, 26:17-20; A-1116, 27:20-25; A-1117, 28:3-7; A-827,44:3-7; A-828, 45:3-19. Dean Bertolami was not engaged with the remedial trainings. A-498, 89:10-16; A-499, 90:3-6; A-502, 93:16-24. Julia Murphy's HR office assisted with the training following OEO's determination, but she did not attend the trainings and recalls "being somewhat distant from the follow-up training in the department." A-712-13, 74:20-75:9; A-714, 76:13-15. Mitch Bloom and Roger Warren—two of Dr. El Chaar's primary tormenters—did not attend OEO 101, and there was no attendance sheet for OEO 102. The College's executive group (the "Executive Group") did not discuss the outcome of the OEO investigation or the OEO Report. A-899, 31:15-23. For instance, Dean Terracio never reviewed the OEO Report, was not aware of the OEO's finding of a hostile work environment, and was not involved in any

8

discussions within the Department about the OEO's findings. A-899-901, 31:24-33:25.

### C. 2018-2019: Dr. El Chaar Suffers Retaliation for his Prior Complaints, NYU Inexplicably Fails to Investigate When Dr. El Chaar Complains of Retaliation

In the Fall of 2018, Dr. Loomer announced he would be leaving NYU. A-279, 147:11-19. Dean Bertolami would determine his replacement. A-915, 47:13-23; A-916, 48:3-11. Dean Bertolami met with Dr. El Chaar shortly after Dr. Loomer's announcement and informed Dr. El Chaar that he would be naming an interim chair rather than appointing a permanent chair and that he would not appoint Dr. El Chaar as interim chair, both because the Department needed a "cooling period" due to Dr. El Chaar's complaint to OEO. A-280, 148:4-23. Instead, Dean Bertolami selected Dr. Sigurdsson, who was chair of the Endodontics Department, to be interim chair. A-915, 47:13-23; A-916, 48:3-11. Dr. Sigurdsson was "a little bit surprised" to be named interim chair and asked Dean Bertolami "why he didn't do something internal[.]" A-1181-82, 24:17-24:7, A-1180, 23:4-17.

After Dr. Sigurdsson was named interim chair, Dean Bertolami told him an OEO Report had been filed and that "Dr. El Chaar had been part of it," but refused to tell Dr. Sigurdsson who had initiated the complaint and refused Dr. Sigurdsson's request to provide him with a copy of the OEO Report. A-1185, 28:2-21; *see also*

9

A-292, 160:10-25. Dr. Sigurdsson "really kind of never paid attention" to whether certain faculty members disliked Dr. El Chaar because he was Lebanese or Middle Eastern; when such issues were raised Dr. Sigurdsson told people "I did not want to even hear that because this is not an issue in my mind." A-1205-06, 48:10-49:2.

In December 2018, Dr. El Chaar filed a retaliation complaint with OEO due to Dean Bertolami's decision to not name a permanent chair and not name Dr. El Chaar interim chair because Dr. El Chaar filed the original OEO complaint. A-1863; A-1868. Dr. El Chaar wrote to Mr. Concepcion and Ms. Signor that, "I was told by Bertolami that decision about hiring and promotion was made not to post the position or form a search committee specifically because I made a complaint over a year ago." A-1868. OEO did not take any action or investigate Dr. El Chaar's December 2018 complaint of retaliation. A-1129, 40:8-19; A-832, 49:16-21; A-834-35, 51:24-52:2; A-837, 54:21-25. NYU's Office of OEO admitted that considering an employee's good faith complaint of discrimination into a promotion decision is a violation of the University's Non-Discrimination and Anti-Harassment Policy and Complaint Procedure for Employees. A-1324-25; A-843, 60:11-23; A-845, 62:13-23; A-724, 86:4-19.

12570044-6

### D. 2019-2020: Dr. El Chaar Continues to Suffer Harassment, NYU Fails to Investigate When Dr. El Chaar Complains Again of Discrimination

Dr. El Chaar continued to complain about ongoing harassment in July 2019. A-719-20, 81:24-82:3; A-1508; A-2145; A-2147. On July 16, 2019, Dr. El Chaar sent letters to Drs. Schreiber and Sigurdsson alleging ongoing harassment on the basis of his ethnicity and religion. A-1872. He wrote, "[s]ince February 2018, when OEO made its findings, nothing has changed. There continues to be a campaign waged against me on the basis of my ethnicity and religion…I find this appalling, after the report of OEO and all the assurances, this atmosphere has continued." *Id*. Dr. El Chaar sent Drs. Schreiber and Sigurdsson a similar letter on July 20, 2019. A-1504. Dr. Schreiber forwarded the July 20 letter to Julia Murphy and Louis Terracio and requested that she and Dr. Sigurdsson be kept "in the loop." A-1505.

Julia Murphy believed that, with this letter, Dr. El Chaar was continuing to complain about the same issues of harassment as he had in the past (A-719-20, 81:24-82:3), but Ms. Murphy did not take any action upon receiving Dr. El Chaar's harassment complaint other than advising Dr. Schreiber and Dr. Sigurdsson to tell Dr. El Chaar to contact the OEO. A-1508. Dr. Schreiber did not recall taking any further action after this letter and did not recall anybody reporting back to her about next steps with respect to the letter. A-1026, 42:11-17. Dr. Sigurdsson

11

recalls a cordial meeting with Dr. El Chaar related to these letters, but noted that he had never heard about these issues from Dr. Bloom or Dr. Warren so "didn't know if this was really hearsay or whatever." A-1196-97, 39:8-40:16. Ms. Signor, the head of OEO, does not recall taking any action regarding Dr. El Chaar's July 2019 complaint of harassment. A-1133,44:15-24.

In the time period after Dr. Sigurdsson took over as interim chair, the racist and ethnic harassment continued. A-294-95, 162:2-163:25; A-1899-902. A lab technician named Steve Pigliacelli regularly texted Dr. El Chaar during this time letting him know that various individuals called him anti-Semitic. *Id*. In October 2022, Dr. El Chaar had lunch with fellow dentists, Laureen and Burt Langer, who told him that as recently as 2021 Dr. Wagenberg told Dr. Langer not to deal with Dr. El Chaar because he was an anti-Semite and fired people because of their Jewish religion. A-258-59, 126:4-127:10. In October 2021, Dr. El Chaar was diagnosed with PTSD and prescribed medication and psychotherapy to treat his condition. A-2058, 34:11-14; A-2064-65, 40:21-41:2; A-2059-60, 35:23-36:6; A-2066, 42:14-19; A-2067-68, 43:15-44:3; A-2069, 45:5-12. Dr. El Chaar's doctor cites his preoccupation with his experiences at NYU as contributing to his PTSD. A-2066, 42:14-19; A-2069, 45:5-12.

E.    **2020: NYU's Dean Again Admits that he Retaliated Against Dr. El Chaar in a Promotion Decision**

In June 2020, Dr. El Chaar and Dean Bertolami had a zoom call about Dr. El Chaar's prospects to one day become chair. Dr. El Chaar recorded the conversation. Dean Bertolami once again told Dr. El Chaar that he did not initiate a search for a permanent chair or name Dr. El Chaar as interim chair because of Dr. El Chaar's OEO complaint, that the Department needed a "period of cooling off." A-2003, 15:5-7. Dean Bertolami explained that the faculty—who had created the hostile work environment Dr. El Chaar endured—would not have accepted him as chair. A-2003,15:20-16:7. He also stated that Dr. El Chaar would have been the "logical choice" as interim, but he did not make that logical choice "not for good reasons, but for political reasons." A-2003, 14:1-6. He also cast doubt on whether the faculty would accept Dr. El Chaar in the future, asking rhetorically, "has enough time gone by for water to pass under the bridge that they would not go…out of their way to mobilize people against you?" A-2005,24:1-4. Dean Bertolami acknowledged that Dr. El Chaar would likely leave NYU if he was not promoted to chair. A-2005, 25:15-16.

In an attempt to assuage Dr. El Chaar's ongoing concerns about the selection of a permanent chair, Dean Bertolami described the method he would use, namely that a search committee would interview candidates on Zoom and select their top three candidates, unranked. A-2008, 34:16-35:7. Dean Bertolami elaborated that

13

"there's no question in my mind that you would be on that top three. And my guess is very likely that you would be number one." (A-2008, 36:1-4). Further, Bertolami told Dr. El Chaar that because the committee would "be told not to rank people…it all comes to pass in a very clean and legitimate way[.]" A-2008, 36:6-8. Dean Bertolami did not mention the use of a survey.

### F. 2021: NYU Again Retaliated Against Dr. El Chaar, Culminating in Dr. El Chaar's Constructive Discharge

Dr. Sigurdsson was initially only hired to be interim chair for six months but served for over two years. A-1219-20, 62:23-63:23. In August or September of 2020, he requested that the Dean start a search or appoint someone else. *Id*. Dr. Sigurdsson told Dean Bertolami that Dr. El Chaar was interested in becoming chair. *Id*. Dr. Sigurdsson thought Dr. El Chaar was very effective, liked by students, and that he had taken on a lot of extra work during COVID to endure students still graduated with sufficient knowledge. A-1263-64, 106:13-107:3; A-1222. Dean Bertolami did not name Dr. El Chaar as interim chair, but did initiate a search for a permanent chair. A-298, 166:6-8; A-920,52:7-12.

Dr. El Chaar applied. Shortly after, in September 2020, Dr. Sigurdsson received an email from a man unaffiliated with the University protesting Dr. El Chaar's candidacy. A-1881. The email accused Dr. El Chaar of being anti-Semitic because he is "[a] man from a country that hates Isreal. A country that

14

wishes to destroy Isreal. A country that will not allow citizens to visit Isreal, a crime that results in deportation." *Id*.

Nevertheless, Dr. El Chaar had many supporters for his bid. A-729-30, 91:9-92:5; A-1055-56, 71:16-72:15; A-1874-79; A-523, 114:8-12; A-1883-85. Dr. El Chaar was one of four finalists for the position. A-541-42, 132:16-133:2. With finalists chosen, it was now Dean Bertolami's responsibility to select the chair. A-1040, 56:12-15; A-1047, 63:9-18; A-939-40,71:25-72:4.

Dean Bertolami then made the unprecedented decision to send out a survey to the Department's faculty—the same faculty who had created a hostile work environment for Dr. El Chaar—to determine whether or not the faculty in Periodontology "would be willing to be led by Dr. El Chaar." A-560, 151:9-19; A-1889; A-927, 59:16-20. He did this, even though he told Dr. El Chaar in 2020 that "it doesn't take much for a disgruntled person to delay everything with all kinds of allegations that have to be defended…" A-2008, 37: 5-8. Pursuant to this purpose, the survey was written to focus on "suitability." A-1897; A-951, 83:12-23. The College had never before used such a survey when searching for a department chair. A-1889-90; A-560, 151:13-19; A-927, 59:16-20. A member of the faculty emailed Dean Terracio with concerns that the survey was like a "political race" and was not an appropriate way to select the chair. A-1887. Dean Terracio, who authored the survey (A-927, 59:5-15), brushed off these concerns (A-935-36,

15

67:24-68:14), though later conceded he could have written a more targeted survey focusing on "educational philosophy, research, process" but "didn't because we were looking just to see about suitability." A-1897; A-951, 83:12-23. Dr. El Chaar received the most #1 rankings in the survey, but this did not stop Dean Bertolami. A-564, 155:4-9; A-1520.

On May 13, 2021, Dean Bertolami decided to select another candidate—Dr. Leena Palomo—to be the chair, citing the survey as the only factor in his announcement email to the executive group. A-1554. The "suitability"-focused survey was a pretext to avoid promoting Dr. El Chaar to chair. Despite the fact that at least one other executive group member preferred Dr. El Chaar to be chair, the executive group never met to discuss the selection and some members never even saw the survey results. A-1883-85; A-1893; A-938, 70:14-22. On May 13, 2021, Dean Bertolami called Dr. El Chaar to inform him of Dr. Palomo's selection, telling him "the survey came back negative against you. And based on the survey, I cannot give you the position." A-303, 171:4-19; A-304, 172:12-22. Dr. El Chaar resigned from the University. A-1556-57. Dr. El Chaar has since avoided another full-time academic appointment, in part due to his PTSD from years of racist abuse at NYU. A-2069, 45:5-12.

16

## V.    STANDARD OF REVIEW

The Court "review[s] a district court's grant of summary judgment de novo, resolv[ing] all ambiguities and draw[ing] all [reasonable] factual inferences in favor of the party against whom summary judgment is sought*." Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (internal quotations removed).

The Court will only grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019)

## VI.    SUMMARY OF THE ARGUMENT

The District Court erred in granting Defendant-Appellee NYU's motion for summary judgment with respect to Plaintiff-Appellant's retaliation claim under Section 1981. The record shows that Dean Charles Bertolami, NYU's sole

17

decisionmaker regarding promotion decisions involving Dr. El Chaar, told him in 2018 when the chair was stepping down that he was appointing an interim as opposed to permanent chair—and that Dr. El Chaar, the admitted "logical choice" to be interim chair, would not be the interim, in both cases because Dr. El Chaar had just filed a complaint of discrimination, which NYU's OEO found to have merit. Dr. El Chaar reported this retaliation to NYU, exchanging multiple emails with NYU's OEO regarding the issue, but no investigation occurred. Less than two years later, this same decisionmaker again repeated that he had not appointed Dr. El Chaar as interim chair because of his complaint of discrimination.

Respectfully, the District Court erred in ignoring and/or discounting this evidence, namely Dr. El Chaar's testimony and contemporaneous written statements about the reasons provided by Dean Bertolami and Dean Bertolami's own words confirming Dr. El Chaar's prior complaints. A rational jury could find that Dr. El Chaar's complaints to OEO were a "but-for" cause of the decision making. In fact, the decisionmaker told him this was the case. It is for the jury to weigh the evidence and make necessary credibility determinations to assess whether NYU's decision to name an interim chair was a pretext for retaliation. With respect to NYU's failure to appoint Dr. El Chaar as permanent chair in 2021, respectfully, the District Court (i) improperly determined that the OEO Report was too far removed from Dean Bertolami's decision to appoint Dr. Palomo over Dr. El

18

Chaar to show a causal nexus and (ii) improperly determined that NYU's use of a survey and preference for Dr. Palomo's credentials were not a pretext for retaliation. Both determinations involve weighing evidence and credibility determinations that should have been left to a jury.

With respect to Dr. El Chaar's claim of a hostile work environment, the District Court improperly found that the continuing violation doctrine does not apply to Dr. El Chaar's hostile work environment claim. After NYU's OEO found that Dr. El Chaar suffered a hostile work environment, NYU failed to address this finding. Dr. El Chaar continued to complain about harassment on the basis of his race and ethnicity and about retaliation for complaining about the harassment, but NYU clearly and admittedly failed to investigate these complaints. A reasonable jury could find that NYU's failure to address OEO's findings and failure to investigate Dr. El Chaar's complaints were tantamount to a policy of permitting discrimination. Moreover, evidence in the record and NYU's own findings make clear that Dr. El Chaar suffered under a hostile work environment. These determinations should also have been left to a jury.

## VII. ARGUMENT

### A. Standard for Retaliation Under 1981

Section 1981 retaliation claims are analyzed under the same standard as those brought pursuant to Title VII. *See Hicks v. Baines*, 593 F.3d 159 (2d Cir.

19

2010). Therefore, to prevail on a retaliation claim brought under Section 1981, "a plaintiff must present evidence that shows" (1) plaintiff's "participation in a protected activity;" (2) "that the defendant knew of the protected activity;" (3) "an adverse employment action; and" (4) "a causal connection between the protected activity and the adverse employment action." *Cadet v. All. Nursing Staff of New York, Inc.*, 632 F. Supp. 3d 202, 222 (S.D.N.Y. 2022) (citing *Hicks*, 593 F.3d at 164); *see also Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018).

"If the plaintiff establishes a *prima facie* case, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Cardwell v. Davis Polk & Wardwell LLP*, No. 1:19-cv-10256, 2023 WL 2049800, at *24 (S.D.N.Y. Feb. 16, 2023) (internal quotations removed).

"'[B]ut for' causation does ***not*** require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y.2011) (explaining that under the Age Discrimination in Employment Act "[t]he condition that a plaintiff's age must be

20

the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers *only* consideration, but rather that the adverse employment actions would not have occurred without it.") (citation omitted); *see also Banks v. Gen. Motors*, *LLC*, 81 F.4th 242 (2d Cir. 2023)(there can be more than one "but-for" cause of an adverse employment action) (citing *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (observing that the but-for test is a "sweeping standard" and that "[o]ften, events have multiple but-for causes").

As this Court has noted, "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Kwan*, 737 F.3d at 846 n.5.

A plaintiff may prove that "retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* at 846. To demonstrate that the defendant's stated explanations were a pretext for retaliation, a plaintiff must present "facts sufficient to warrant a reasonable jury finding by a

preponderance of the evidence that 'the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [retaliation].'" *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. Mar. 25, 2010) (summary order) (all alterations in original) (quoting *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008).

### B. A Reasonable Jury Could Find That Appellee Retaliated Against Appellant in Failing to Appoint Him as Interim Chair

The District Court correctly determined that Appellant made out a prima facie case of retaliation with respect to NYU's failure to appoint Dr. El Chaar as interim chair (SPA-14). Plaintiff participated in protected activity on numerous occasions with his complaints to Julia Murphy, the OEO, and multiple administrators and deans about both discrimination and hostile work environment on the basis of his race, ethnicity, and national origin. A-164-65, 32:19-33:6; A-221, 89:20-22; A-221, 89:20-22; A-688-89, 50:14-51:7; A-291, 159:3-20; A-1035-36, 51:2-52:7; A-262-63; A-699, 61:2-22. Defendant was certainly aware of the multiple instances of protected activity and, in fact, confirmed that Dr. El Chaar was the victim of a hostile work environment. A-1457-78.

NYU made a decision not to fill a chair position and then not to make Dr. El Chaar the interim chair because he complained of discrimination to OEO. After this conversation in November or December 2018, Plaintiff almost immediately

complained to the OEO that Dean Bertolami's actions and admission constituted retaliation, writing: "I was told by [Dean] Bertolami that decision about hiring and promotion was made not to post the position or form a search committee specifically because I made a complaint over a year ago." A-1868. Further contemporaneous communications from Dr. El Chaar to NYU about this retaliation did not occur because NYU chose not to investigate Dr. El Chaar's allegation. A-1129, 40:8-19; A-832, 49:16-21; A-834-35, 51:24-52:2; A-837, 54:21-25.

In 2020, Dean Bertolami confirmed the truth of Dr. El Chaar's uninvestigated retaliation allegation when he told Dr. El Chaar that he did not post the position and did not place Dr. El Chaar as interim because he felt there needed a "period of cooling off." A-2003, 15:5-7. He also stated that Dr. El Chaar would have been the "logical choice" as interim, but he did not make that logical choice "not for good reasons, but for political reasons." A-2003, 14:1-6.

The District Court erred in finding that NYU articulated a legitimate, nonretaliatory basis for failing to appoint Dr. El Chaar as the interim chair. Respectfully, there is clear evidence in the record that Dean Bertolami's stated justification for not appointing Dr. El Chaar as interim chair in 2018—that interim chairs were routinely appointed at NYU Dentistry—was a pretext for retaliation. Dr. El Chaar testified that in the Fall of 2018 Dean Bertolami informed him that he would be naming an interim chair rather than appointing a permanent chair and

23

that he would not appoint Dr. El Chaar as the interim chair because Dr. El Chaar had complained to the OEO. A-280, 148: 4-13. In addition to Dr. El Chaar's testimony on this point—which standing alone would be sufficient to defeat summary judgment—the record shows that in December 2018, Dr. El Chaar filed a retaliation complaint with OEO due to Dean Bertolami's statement to him and decision to not name a permanent chair and not name him as interim chair because he filed the OEO Complaint. A-1863-70.

The District Court acknowledged that "[a]t the summary-judgment stage, the Court is bound to accept El Chaar's version of his conversation, and, standing alone, it could suggest that the 'legitimate reasons offered by the defendant[] were not [its] true reasons." SPA-16 (quoting *Cardwell*, 2023 WL 2049800, at *36). However, the District Court held that "this one comment is insufficient to meet El Chaar's burden to show but-for causation, given the admitted problems in the Department and the common practice of appointing interim chairs." SPA-16-17. The District Court then cited to *Fincher v Depository Trust & Clearing Corp.*, in which the court held "that an 'offhand' remark offers a 'scintilla of evidence' in support of pretext but, without 'further support in the record,' is not sufficient for a jury to find that a supervisor's comment was made with a discriminatory motive." *Id*., quoting *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

Respectfully, the District Court's reliance on *Fincher* was misplaced, as Dean Bertolami's clear confession of his motive in failing to promote Dr. El Chaar was more than an "offhand remark." In *Fincher*, the plaintiff testified in support of her discrimination claim—not retaliation—that a manager admitted to her in a private conversation that she had been discriminated against. There, the court found that this one offhand comment was not sufficient to support the plaintiff's discrimination claim. This is clearly distinguishable from Dean Bertolami's comment to Dr. El Chaar that he would not appoint him as permanent or interim chair because he had filed the OEO Complaint. Respectfully, Dean Bertolami's statement here is hardly an "offhand" comment; it was the statement of the primary decisionmaker explaining his retaliatory rationale for the adverse employment action that Dr. El Chaar experienced. *See Abreu v. Suffolk Cnty. Police Dep't*, No. 03-CV-5927, 2007 WL 608331, at *14 (E.D.N.Y. Feb. 23, 2007) ("Verbal comments may constitute direct evidence of retaliation when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action."); *see also Rasmy v. Marriott Int'l, Inc.* 952 F.3d 379, 391-392 (2d Cir. 2020) (In finding triable issue of fact as to whether raising issues of discrimination led to adverse employment action, noting that "[a]s our cases hold, the question of what motivated an employer's desire to fire a worker is a quintessential jury function"). In *Rasmy*, in overturning the lower court's finding

25

of summary judgment for defendant in a retaliation case despite a lack of direct evidence, this Court noted that "plaintiffs rarely produce direct evidence of retaliation" *Id.* at 392. Here, while direct evidence is not required, a rational jury could certainly find that taped conversation wherein Bertolami admits his rationale for his decision (i.e., the necessity of "cooling off" period) and that his decision was made "not for good reasons, but for political reasons" is direct evidence of NYU's motivation and retaliation.

The District Court reasoned further that there was other evidence in the record that weakened the inference that Dean Bertolami's comment demonstrated retaliatory motive, including that Dean Bertolami later clarified that "'[o]ther people' needed a cooling-off period, not El Chaar" (SPA-17) and that Dean Bertolami "referenced the OEO complaint" but "did not suggest that El Chaar did anything wrong by filing it." *Id*. A reasonable jury could find that Dean Bertolami did not merely "reference" the OEO Complaint; he used it as a justification to not promote Dr. El Chaar, especially given Dean Bertolami's tape-recorded concession that he made this decision "not for good reasons, but for political reasons." A-2003, 14:1-6.

Respectfully, the District Court is incorrect in its finding that Dr. El Chaar has not offered evidence that Dr. El Chaar filing the OEO complaint motivated Dean Bertolami's actions with respect to the promotion decision. (SPA-17). The

Court overlooks that Dr. El Chaar complained in writing about an almost identical comment by Dean Bertolami regarding the promotion rationale two years prior—"I was told by Bertolami that decision about hiring and promotion was made not to post the position or form a search committee specifically because I made a complaint over a year ago." (A-1868). Dr. El Chaar testified that Dean Bertolami told him in 2018 that "you complained to OEO, and we needed a cooling period" (A-280, 148:22-23) and Dr. El Chaar contemporaneously complained in writing about Dean Bertolami's statement to him. (A-1863-70). In fact, a rational jury could very reasonably find Dean Bertolami's 2020 statement, repeating the same "cooling off" phrase, reinforces Dr. El Chaar's prior complaint. Again, this is hardly a single "offhand" comment.

Finally, the District Court erred in weighing the credibility of Dr. El Chaar's and Dean Bertolami's testimony at summary judgment; these determinations should more appropriately be left for a jury to make. In deciding a motion for summary judgment, "the court *may not make credibility determinations or weigh the evidence*, and it must *draw all reasonable inferences in favor of the nonmoving party...*even though contrary inferences might reasonably be drawn[.]" *Davis-Garett*, 921 F.3d at 46 (citations and quotations removed; emphasis in original) (reversing District Court's grant of defendant's summary judgment motion on retaliation claim where "the district court appears not to have considered the record

27

as a whole and plainly did not describe it in the light most favorable to [plaintiff]"). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id* at 46-47; *see also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 146 (2d Cir. 2012) (reversing the District Court's grant of defendant's motion for summary judgment on retaliation claim as the District Court raised "questions about the credibility and probative force of [Plaintiff's] evidence" that are "to be answered by the jury[.]" Here, Dr. El Chaar testified that Dean Bertolami told him he would not be named permanent or interim chair because he complained to OEO. A-280, 148:4-23. Dr. El Chaar promptly complained about this retaliation to OEO. (A-1863-70). Two years later, Dean Bertolami repeated this same "cooling off" rationale—using the same words—in a recorded call with Dr. El Chaar. (A-2003, 15:5-10). Dr. El Chaar's version of events is certainly plausible; if his testimony about the 2018 call with Dean Bertolami is found to not be credible, that is a determination to be made by a jury, not by the District Court.

## C. A Reasonable Jury Could Find That Appellee Retaliated Against Appellant in Failing to Appoint Him as Permanent Chair

The District Court erred in finding that Dr. El Chaar failed to make out a prima facie case of retaliation for NYU's failure to appoint him as the permanent chair in 2021. SPA-18. As the District Court correctly noted, Dr. El Chaar meets

the first three prongs because he "is a member of a protected class, was qualified for the position of permanent chair, and was denied the position." *Id*. However, the District Court held that Dr. El Chaar did not make out a prima facie case of retaliation on this point because "the causal inference in his prima facie case is weaker, as over three years had passed between his OEO complaint and Palomo's selection as chair." SPA-23. Appellant respectfully submits that this conclusion is incorrect, as Dean Bertolami and Dr. El Chaar were still actively discussing the OEO Complaint as of June 2020, shortly before Dean Bertolami began the search for a new permanent chair.

On their June 2020 Zoom call, Dean Bertolami explained that he did not name Dr. El Chaar as chair in 2018 because of Dr. El Chaar's OEO complaint, that the Department needed a "period of cooling off" and the faculty would not have accepted him as chair (A-2003,15:20-16:7), and then cast doubt on whether the faculty—who NYU's OEO had found create a hostile work environment for Dr. El Chaar—would accept Dr. El Chaar in the future, asking rhetorically, "has enough time gone by for water to pass under the bridge that they would not go…out of their way to mobilize people against you?" A-2005, 24:1-4. Dean Bertolami questioned Dr. El Chaar's "emotional temper in relation to how others in the department" viewed him, then commented that it was positive that "things seem to

29

have quieted down." A-2004, 18:21-24; 19:9-13. A jury could view this statement as a warning from Dean Bertolami from future complaints to OEO.

Given that Dean Bertolami was recorded considering the OEO Complaint as a factor in whether to promote Dr. El Chaar in June 2020 shortly before initiating the search for a permanent chair, a jury could certainly reasonably find a causal link between the OEO Complaint and Dean Bertolami's selection.

Dean Bertolami clearly had animus with respect to Dr. El Chaar based upon his prior complaints to OEO. Dean Bertolami told his boss that Dr. El Chaar had contributed to the hostile work environment, despite the investigators of Dr. El Chaar's hostile work environment complaint and the authors of the OEO Report specifically testified that Dean Bertolami's suggestion was incorrect. (A-1860; A-1136-37, 47:10-48:16; A-514,105:2-5). Dean Bertolami admitted that he did not consider Dr. El Chaar for the interim position because of his prior complaint to OEO (A-280, 148: 4-23) and, in discussing the forthcoming search for a permanent chair, asked Dr. El Chaar "has enough time gone by for water to pass under the bridge that they would not go…out of their way to mobilize people against you?" A-2005, 24:1-4.

In the context of this animus, Dean Bertolami used a survey of the faculty—the same faculty who had created the hostile work environment Dr. El Chaar suffered—to justify not promoting Dr. El Chaar. The survey was focused not on

30

accomplishments or credentials but rather on "suitability" in order to determine whether the faculty "would be willing to be led by Dr. El Chaar." A-560, 151:9-19; A-1889; A-927, 59:16-20. Dean Bertolami relied on this survey even though a faculty member flagged concerns that the survey was akin to a "political race" and was not an appropriate way to select the next chair. A-1887. Moreover, the author of the survey later conceded the survey could have been more focused on "educational philosophy, research, process" but "didn't because we were looking just to see about suitability." A-1897; A-951, 83:12-23. Notably, this survey was a departure from the process Dean Bertolami outlined for Dr. El Chaar, in which the search committee would submit three candidates unranked to Dean Bertolami for selection so "it all comes to pass in a clean and legitimate way." A-2008, 34:16-35:7; A-2008, 36:1-4; A-2008, 36:6-8.

   In announcing his reason for selecting Dr. Palomo over Dr. El Chaar, Dean Bertolami cited the new faculty "suitability" survey as the only factor in his announcement email to the executive group. A-1554. Consistent with this, he told Dr. El Chaar that he was not selected because "the survey came back negative against you…[a]nd based on the survey, I cannot give you the position." A-303, 171:4-19; A-304, 172:12-22. Dean Bertolami testified that he met with members of his Executive Group about the decision to choose Dr. Palomo and that decision was unanimous, (A-559, 150:4-16; A-551, 142:4-5) but members of the Executive

31

Group did not recall meeting about the decision to choose Dr. Palomo; meeting minutes do not reflect such a meeting; emails show that at least one member who actually did rank the candidates believed Dr. El Chaar was the top candidate with Dr. Palomo third or fourth (A-1883); and—most damning—members of the Executive Group did not know that Dean Bertolami had selected Dr. Palomo until he sent an email announcing it.  A-1054, 70:15-22; A-940, 72:5-10; A-1554.

Ultimately, it was Dean Bertolami's decision alone regarding the selection of the chair. He made prior promotion decisions because Dr. El Chaar complained and his testimony regarding the decision in 2021 and others' input is, at best, inconsistent and, at worst, untruthful. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan*, 737 F.3d at 846. Here, Dr. El Chaar has identified exactly kinds of "weaknesses, implausibilties, inconsistencies, or contradictions" in NYU's proffered nonretaliatory reasons.

Nevertheless, the District Court held that NYU offered a legitimate, non-retaliatory justification for not promoting Dr. El Chaar because Dean Bertolami "regularly elicited feedback from department faculty before appointing a chair to

lead them." SPA-20. However, there is abundant evidence in the record for a jury to find that Dean Bertolami's use of the survey was a pretext for retaliating against Dr. El Chaar, and summary judgment is inappropriate where a reasonable jury could find that facially race neutral actions were taken with discriminatory intent. *See United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 401 (S.D.N.Y. 2018).

The District Court also held that NYU proffered a legitimate, non-retaliatory rationale for selecting Palomo because she "was a tenured professor and a member of multiple professional organizations, which 'suggested strong interpersonal skills, academic record, reputation and leadership'" whereas Dr. El Chaar was "not on a tenure track, had been rejected for promotion, and called people within the department 'enemies.'" SPA-21. However, looking to other evidence, a reasonable jury could find that this cited rationale was not the true reason. One, if lacking tenure was disqualifying, Dr. El Chaar could not have been a finalist for the chair position. Tenure track was not a requirement for the position. A-1033, 49:19-22. Two, Dean Bertolami cited the new faculty "suitability" survey as the only factor for selecting Dr. Palomo in his announcement email to the executive group. A-1554.

NYU's proffered reasons for the decision to not promote Dr. El Chaar are contradicted by Dean Bertolami's own words and emails, and Dean Bertolami's

testimony about the decision-making process is contradicted by the other admissible evidence cited above. Dean Bertolami had already explicitly told Dr. El Chaar in 2018 and 2020 that he made a previous decision about the same chair position because of his complaints to OEO. A-280, 148:4-23. Given the inconsistencies noted above, a reasonable jury could certainly find that Dean Bertolami had a retaliatory motive in choosing Dr. Palomo.

### D.  Standard for Hostile Work Environment Under 1981

"To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must 'produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Banks*, 81 F.4th at 261. "Evidence of a general work atmosphere ... —as well as evidence of specific hostility directed toward the plaintiff — is an important factor in evaluating the claim." *Id.* at 262.

Hostile work environment claims by their "very nature involve[] repeated conduct…that collectively constitute one 'unlawful employment practice,' it does not matter that some of the component acts fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103

34

(2002*); see also Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) ("When a plaintiff experiences a 'continuous practice and policy of discrimination,' however, 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"). "[E]ven where there is no formal policy, the continuing violation theory may be used where there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001).

E. **The District Court Should Have Considered The Complete History of Dr. El Chaar's Discrimination and Hostile Work Environment**

In February 2018, within the applicable statute of limitations in this matter, NYU's OEO issued its report finding that there was evidence to support Dr. El Chaar's complaint of a hostile work environment. (A-1457-78). Respectfully, the District Court erred in holding that the continuing violation doctrine does not apply to Dr. El Chaar's hostile work environment and discrimination claim. (SPA-10-12). An "entire hostile work environment encompasses a single unlawful employment practice" because the "very nature" of a hostile work environment "involves repeated conduct*." Nat' R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002).

35

Dr. El Chaar explicitly told NYU that the hostility had not stopped following the damning OEO Report.  A-719-20, 81:24-82:3; A-1508; A-2145; A-2147.  In July 2019, Dr. El Chaar wrote multiple letters to Drs. Schreiber and Sigurdsson alleging ongoing harassment on the basis of his ethnicity and religion, writing, "[s]ince February 2018, when OEO made its findings, nothing has changed.  There continues to be a campaign waged against me on the basis of my ethnicity and religion…I find this appalling, after the report of OEO and all the assurances, this atmosphere has continued."  A-2147.  Despite the fact that Dr. El Chaar was continuing to complain about the same issues of harassment detailed in the OEO Report, NYU did nothing.  A-1026, 42:11-17; A-1196-97, 39:8-40:16; A-1133,44:15-24.  HR recommended that Drs. Schreiber and Sigurdsson forward the letter to OEO, but the head of OEO does not recall taking any action. A-1133,44:15-24.

In addition to complaining about discrimination, Dr. El Chaar complained about retaliation. In December 2018, Dr. El Chaar filed a retaliation complaint with OEO due to Dean Bertolami's decision about not naming a permanent chair and not naming him interim chair because he filed the original OEO complaint.  A-1863; A-1868.  As with Dr. El Chaar's complaint of discrimination, OEO did not take any action or investigate Dr. El Chaar's December 2018 complaint of retaliation, (A-1129, 40:8-19; A-832, 49:16-21; A-834-35, 51:24-52:2; A-837,

36

54:21-25), even though factoring in an employee's good faith complaint of discrimination into a promotion decision is a violation of the University's Non-Discrimination and Anti-Harassment Policy and Complaint Procedure for Employees. A-1324-25; A-843, 60:11-23; A-845, 62:13-23; A-724, 86:4-19.

A reasonable jury could conclude that NYU's failure to investigate Dr. El Chaar's complaints of discrimination and retaliation is part of the continuing course of discriminatory conduct underlying his claim of hostile work environment by ignoring or downplaying his prior complaints. Respectfully, the District Court completely elided evidence presented by Dr. El Chaar that NYU failed to respond or investigate ***at all*** his December 2018 claim of retaliation and his July 2019 claim of harassment. (SPA-10-12). A jury should weigh the credibility of Dr. El Chaar's complaints—complaints that its own Assistant Dean of Human Resources acknowledges were the same issues as he complained about previously. A-719-20, 81:24-82:3), assess NYU's response, and determine whether NYU allowed discrimination against Dr. El Chaar "to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald*, 251 F.3d at 362.

In addition, NYU failed to remedy the hostile work environment identified by its own OEO (A-1904; A-1939; A-1115, 26:17-20; A-1116, 27:20-25; A-1117, 28:3-7; A-827,44:3-7; A-828, 45:3-19). A jury could have considered Dean

37

Bertolami's failure to engage with the response to the OEO complaint and the inability to recall the content of the presentations used address the complaint (A-498, 89:10-16; A-499, 90:3-6; A-502, 93:16-24), Julia Murphy's statement that she was "somewhat distant" from the training and did not attend the training (despite her office's responsibility for assisting with the training)( A-712-13, 74:20-75:9; A-714, 76:13-15.), Dean Terracio's failure to review the OEO Report (A-899-901, 31:24-33:25), and determined that NYU failed to address the hostile work environment. A jury also could have weighed Dean Bertolami's statement that Dr. El Chaar was responsible for the hostile work environment (A-512-13, 103:21-104:5, A-2004, 19:17-21), that Dr. El Chaar was an "extremely divisive individual" who should have "overcome" the hostile work environment "with a desire to advance his career so that he was not the focus of antagonism" A-514-15,105:22-106:5; A-552-53,143:11-144:3. Instead, the District Court ignored most of this evidence cited in Plaintiff's 56.1 and determined that Dr. El Chaar did not offer sufficient evidence that NYU's response was inadequate. This weighing of the evidence is improper at summary judgment and should be left to a jury. *See Fitzgerald*, 251 F.3d at 366 ("the weighing of the evidence and the decision as to which of competing inferences is to be drawn is solely within the province of the factfinder.")

### F.  A Reasonable Jury Could Have Found That Dr. El Chaar Suffered Discrimination and a Hostile Work Environment

Dr. El Chaar experienced harassment and discrimination based on his race, ethnicity, and perceived religion for decades at NYU. Dating back to the 1990s, colleagues repeatedly called him "camel jockey" and "terrorist." A-207-08, 75:7-76:4; A-164, 32:9-14; A-208, 76:5-16; A-1364. He was regularly accused of being anti-Semitic, firing Jewish faculty, and favoring "Arab" students because of his national origin. A-160-61, 28:6-29:17. In 2016 a fellow employee told Dr. El Chaar that one colleague, Dr. Warren, referred to him as "Hitler" because he was "getting rid of the Jewish Faculty" and told people he had a plaque that said "Fuhrer." A-247, 115:8-24.

This is exactly the sort of severe and pervasive harassment based on ethnicity and race that is prohibited by Section 1981. When the OEO investigated Dr. El Chaar's complaint of harassment in 2018, it found that "the complained-of conduct by multiple faculty members, particularly in the presence of NYU students, is sufficient to create an 'intimidating, hostile or offensive working environment' or otherwise 'interfere[] with an employee's work performance.'…Accordingly, there is evidence to support Complainant's collective allegations of a hostile work environment."  A-1457; *see also* A-1119, 30:4-9; A-822, 39:17-22. In making this determination, OEO examined "the totality of the circumstances, including the frequency of the conduct; the severity of the conduct;

39

and, whether the conduct is physically threatening or humiliating, or a mere offensive utterance." A-1474. Dean Bertolami even testified that "it was certainly true that those were really inexcusable and credible allegations that Dr. El Chaar made against those specific faculty." A-515-16, 106:23-107:8. Given the testimony—from both Dr. El Chaar and Dean Bertolami—regarding the hostile work environment Dr. El Chaar experienced, the contemporaneous written complaints about the hostile work environment, and NYU's own finding that he suffered a hostile work environment, a rational jury could find that Dr. El Chaar suffered a hostile work environment. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 550 (2d Cir. 2010) ("If a jury were to view the evidence in the light most favorable to [plaintiff], it could easily conclude, permissibly, that there occurred a plethora of incidents in the relevant 16–month period and that the abuse was severe and/or pervasive."); *Fitzgerald*, 251 F.3d at 365–66 (reversing the district court's grant of summary judgment on a hostile work environment claim where "the court viewed the record in piecemeal fashion, failed to draw all permissible inferences in [plaintiff's] favor, and resolved questions of fact that are reserved for decision by a jury."); *Banks*, 81 F.4th at 266 ("Because the record indicates that [plaintiff] and other African American employees were the target of 'frequent and highly repugnant insults,' we conclude that a reasonable jury could find that the use of

40

racial epithets and other racially motivated conduct was sufficiently pervasive—even if not independently severe —to support a hostile work environment claim.).

## VIII. CONCLUSION

Plaintiff-Appellant Dr. El Chaar respectfully requests this Court reverse the District Court's Order and Judgment, which granted Defendant-Appellee NYU's motion for summary judgement.

Dated: August 1, 2024

By: */s/ Michael J. Passarella*

Michael J. Passarella
Stephen P. Ross
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, New York 10019
Telephone: (212) 451-2300
Facsimile: (212) 451-2222
mpassarella@olshanlaw.com
spross@olshanlaw.com

David Boies
Valecia Battle
Boies Schiller Flexner LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8311
dboies@bsfllp.com
vbattle@bsfllp.com

*Attorneys for Appellant*

41

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(I), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,354 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

Order of the Honorable Analisa Torres, dated
    March 28, 2024, Appealed From ..........................   SPA-1

Judgment, dated March 29, 2024, Appealed From ....   SPA-26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. EDGARD EL CHAAR,

                                    Plaintiff,

        -against-

NEW YORK UNIVERSITY COLLEGE OF
DENTISTRY,

                                    Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   03/28/2024

22 Civ. 856 (AT)

**ORDER**

ANALISA TORRES, District Judge:

In this employment discrimination action, Plaintiff, Edgard El Chaar, a professor of

periodontology, alleges that Defendant, the New York University College of Dentistry ("NYU

Dentistry"), subjected him to a hostile work environment, refused to promote him, and constructively

discharged him on the basis of his race and national origin. El Chaar asserts discrimination and

retaliation claims pursuant to (1) 42 U.S.C. § 1981; (2) the New York State Human Rights Law (the

"NYSHRL"), N.Y. Exec. Law § 296; and (3) the New York City Human Rights Law (the

"NYCHRL"), N.Y.C. Admin. Code § 8–107. *See* ECF No. 2 at 18–23. Pursuant to Federal Rule of

Civil Procedure 56, NYU Dentistry moves for summary judgment. Def. Mot., ECF No. 36. For the

reasons stated below, the motion is GRANTED as to El Chaar's § 1981 claims, and El Chaar's

NYSHRL and NYCHRL claims are DISMISSED without prejudice to renewal in state court.

**BACKGROUND**[1]

In 1993, El Chaar graduated from dental school in Lebanon and moved to the United States to

attend a one-year international program at NYU Dentistry. Def. 56.1 ¶ 1, ECF No. 50-2. For nearly

---

[1] The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise
noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement also include the opposing party's
response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the
[s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)
(alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the
non-moving party. *Id.* at 69.

twenty-six years, El Chaar was a NYU Dentistry employee—first, as a part-time faculty member from 1995 to 2012, and then as a full-time faculty member and program director of the postgraduate periodontology program from 2013 to 2021.  *Id.* ¶¶ 3–4.

NYU Dentistry is led by a dean and an informal executive committee.  *Id.* ¶¶ 6–9.  Since 2007, Charles Bertolami has served as dean.  *Id.* ¶ 6.  The school is divided into eleven departments, each of which has its own chair that reports to Bertolami.  *Id.* ¶¶ 5, 8.  He is the ultimate decision-maker in appointing chairs.  Pl. 56.1 ¶ 86, ECF No. 51.  The second-largest department—with over 120 faculty members—is the Department of Periodontology and Implant Dentistry (the "Department").  Def. 56.1 ¶¶ 28–29.

During El Chaar's first stint at NYU Dentistry, he taught one day a week at most.  *Id.* ¶ 53.  Faculty members made "sporadic" comments to El Chaar, who is Lebanese, about his ethnicity and race.  *Id.* ¶ 42; Pl. 56.1 ¶ 1.  El Chaar alleges that, between 1994 and 1997, a part-time faculty member called El Chaar a "camel-jockey," and that around 2001, the former program director of postdoctoral periodontology called El Chaar a "dirty Arab."  Def. 56.1 ¶¶ 43, 49.

In 2012, El Chaar left the Department to become the program director at Lutheran Medical Center.  *Id.* ¶ 53.  In August 2013, he returned to NYU Dentistry as the Department's program director of postdoctoral periodontology.  *Id.* ¶¶ 54, 58.  In May 2014, Peter Loomer, then the Department chair, recommended withholding El Chaar's raise for poor performance, citing his failure to hold required faculty meetings, his "authoritarian attitude," and complaints from residents and faculty about his "unprofessional behavior."  *Id.* ¶ 80; *see* ECF No. 38-18.  And, in November 2016, another professor complained that El Chaar "had treated her in an unprofessional, aggressive, and hostile manner," and had subsequently cut her out of Department business.  Def. 56.1 ¶¶ 89–90, *see* ECF No. 38-29.  However, the associate dean for graduate and postgraduate programs testified that El

Chaar improved the Department's postgraduate program during his tenure as program director.  Pl. 56.1 ¶ 23.

In August 2017, El Chaar filed a complaint with NYU's Office of Equal Opportunity ("OEO"), charging Loomer and two other professors, Roger Warren and Mitchell Bloom, with discrimination and retaliation.  Def. 56.1 ¶ 102.  Following interviews with El Chaar, Loomer, Warren, Bloom, and witnesses, on February 7, 2018, the OEO issued a report (the "OEO Report"), which concluded that "none of the individual respondents had engaged in conduct that by itself would rise to the level of a policy violation."  *Id.* ¶¶ 107–08; *see* OEO Report, ECF No. 38-36.  However, OEO found that certain allegations (the "Report Acts"), including that Loomer called El Chaar "anti-Semitic" and that Warren called him a "foreigner," were corroborated by at least one witness.  OEO Report at 20–21.  The sum of the Report Acts gave OEO "pause for concern" and led to the conclusion that "there is evidence to support [El Chaar]'s collective allegations of a hostile work environment."[2]  *Id.* at 21.  The OEO Report was provided to Bertolami, who, after conferring with the OEO investigator who wrote it, required NYU Dentistry faculty to attend a two-part training program "related to non-discrimination/anti-harassment."  *Id.* ¶¶ 110–12.

In the fall of 2018, Loomer announced that he would be resigning as Department chair to take a position in Texas.  *Id.* ¶¶ 121–22.  Because Loomer could not remain during the search for a permanent replacement, Bertolami decided to appoint an interim chair.  *Id.* ¶ 123.  In November 2018, Bertolami named Asgeir Sigurdsson, then chair of the endodontics department, as interim chair. *Id.* ¶ 129.

---

[2] In notes dated April 25, 2018, Bertolami wrote to himself, "The OEO found that the [D]epartment had a hostile work environment; however, it was not attributable to anyone named by El Chaar.  My interpretation was that this was because it was clear that El Chaar was contributing his share to the hostile work environment."  ECF No. 44-3 at 2.  The OEO Report does not state that El Chaar contributed to the hostile work environment.  *See* Def. 56.1 ¶ 107.  The head of OEO at the time, Mary Signor, testified that it would have been noted in the OEO Report if the investigators had determined that El Chaar had contributed to the hostile work environment, but also stated that his contribution was not within the scope of the OEO Report.  Signor Tr. at 47:10–48:14, ECF No. 38-9.

Prior to Bertolami's appointment of Sigurdsson, El Chaar spoke to Bertolami about his interest in the interim position. *Id.* ¶ 122. According to El Chaar, Bertolami said, "[Y]ou complained to OEO, and we needed a cooling period." El Chaar Tr. at 148:22–23, ECF No. 38-3. El Chaar also testified that Bertolami said, "You complained. Nobody is going to be in front of the [D]epartment, we are going to [have] an outside interim chair and we are going to let things cool down." *Id.* at 150:6–9.

Bertolami testified that he did not recall the conversation with El Chaar, but remembered his feeling that "everyone would benefit from a cooling-off period, from a calming time under . . . Sigurdsson, who everyone liked and was an excellent administrator, who Dr. El Chaar liked." Bertolami Tr. at 116:13–23, ECF No. 38-4. Bertolami said that El Chaar's OEO complaint did not play a role in his decision to appoint Sigurdsson and was a "very minor thing that [he] thought was resolved." *Id.* at 117:10–11. Bertolami also said that there was "some hostility between the two divisions" of the Department, and "it seemed like there was . . . a general sense of unpleasantness in the [D]epartment long before Dr. El Chaar, but continuing even after he was there," so Sigurdsson, as an "excellent administrator, would provide some very good leadership in that department." *Id.* at 117:19–118:8. Bertolami claimed that this was a "routine way of operating academically, particularly when the [chair] is leaving," *id.* at 121:14–15, and was not an "impediment" to El Chaar's candidacy for the permanent position, *id.* at 122:8–9.[3] Bertolami said that the Department had had an interim chair from 2010 to 2012—an administrator from outside the Department—"to sort out the various problems that existed, whether interpersonally or clinically" before he "opened a search for the definitive chair" in 2012. *Id.* at 55:12–15, 59:6–60:23; *see* Def. 56.1 ¶¶ 32–35.

---

[3] Around December 2018, El Chaar made a retaliation complaint to OEO based on Bertolami not appointing him as interim chair. Def. 56.1 ¶ 131. OEO did not investigate the retaliation claim. *Id.* ¶ 133. The parties dispute why OEO did not do so: OEO claims that it lacked jurisdiction, and El Chaar says that it simply failed to follow prescribed practices. *Id.* However, neither party argues that OEO's failure to investigate is material to El Chaar's claims.

El Chaar does not dispute that when Loomer resigned, the Department was "fractious" and faced issues with "(1) patient complaints, (2) concerns with the rigorousness of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues." Def. 56.1 ¶ 126.  Bertolami hoped that Sigurdsson would "improve the situation in the Department to maximize the number of excellent candidates who would apply for the permanent position."  *Id.* ¶ 129.

By letter dated July 20, 2019, El Chaar asked Sigurdsson to remove from the Department Vera Tang and Robert Horowitz, two faculty members.  *Id.* ¶ 151; *see* ECF No. 38-41.  For the previous ten months, El Chaar had been feuding with them because Horowitz had said at a public conference hosted by Tang that the Department's "faculty destroyed the program," and El Chaar interpreted this comment to be about him.  *See* Def. 56.1 ¶¶ 142–50.  In the letter, El Chaar claimed that "[t]here continues to be a campaign waged against me on the basis of my ethnicity and religion," stating that Warren and Bloom—about whom he had made the earlier OEO complaint—accused him of being anti-Semitic; El Chaar, however, offered no further details.  ECF No. 38-41.  The letter indicated that El Chaar spoke with Sigurdsson about his concerns.  *Id.*

On June 27, 2020, El Chaar and Bertolami met via Zoom, and El Chaar recorded the conversation without Bertolami's knowledge.  Def. 56.1 ¶ 154.  Bertolami said that El Chaar would have been a "logical choice" as the interim chair but that Bertolami did not appoint El Chaar for "political reasons."  ECF No. 44-19 at 14:1–6.  Bertolami said that he did not appoint El Chaar as the interim in part to help El Chaar's chances of becoming the permanent chair.  *Id.* at 12:22–13:1, 14:1–6, 38:5–6.  Bertolami said that "[t]he dean is not the king" and that "people have to be willing to follow the" chair, so he thought that "what would benefit [El Chaar] is a period of cooling off.  Not [El Chaar] cooling off. . . . Other people cooling off."  *Id.* at 14:14–15:10.  El Chaar told Bertolami that his relationship with the faculty was now positive and that, although his relationship with Bloom

remained poor, he had made peace with Warren, whom he called "the main instigator." *Id.* at 27:10–28:12, 29:19–23. The two discussed whether it was time to open a search for a permanent Department chair to replace Sigurdsson. Def. 56.1 ¶¶ 155–56. Bertolami said that if the search were opened, El Chaar "would be a strong candidate and would likely be the final choice for chair." *Id.* ¶ 157.

Following the Zoom meeting, Bertolami recommended to NYU Dentistry's executive committee that it was time to begin a search for a permanent chair. *Id.* ¶ 158. The search committee did not include "faculty who had a history of conflict with" El Chaar. *Id.* ¶¶ 159–60. El Chaar does not allege that any members of the search committee were biased against him. *Id.* ¶ 165. El Chaar applied, and the search committee recommended him as one of four finalists. *Id.* ¶ 167.

Although Bertolami had the ultimate say in selecting the permanent chair, he consulted his executive committee. Pl. 56.1 ¶ 86; Def. 56.1 ¶ 185. Bertolami sought "a candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor." Def. 56.1 ¶ 169. The four finalists interviewed with each member of the executive committee and gave a seminar via Zoom to the NYU Dentistry faculty. *Id.* ¶¶ 170–71. During his interview with Bertolami, El Chaar said that he planned to fire four or five members of the Department upon becoming chair, which concerned Bertolami. Pl. 56.1 ¶ 81. El Chaar also said that he would resign if he did not receive the promotion. Def. 56.1 ¶ 190. He had previously made a similar statement to Sigurdsson. *Id.* ¶ 189.

Bertolami then sent a survey to the NYU Dentistry faculty to assess the seminars and each "candidate's suitability to be chair." *Id.* ¶ 172. Bertolami "regularly solicited the faculty's feedback when selecting a chair," *id.* ¶ 178, and he decided to use a written survey because the pandemic made it difficult for the faculty to gather in person, *id.* ¶ 173. Bertolami was particularly interested in

6

"whether or not the faculty in Periodontology would be willing to be led by [] El Chaar" in light of El Chaar's interview comment.  Pl. 56.1 ¶ 81.  The survey was sent to 77 faculty members and was completed by approximately 40.  Def. 56.1 ¶ 175.  El Chaar testified that Tang, Wayne Kye, and Roya Mohajer—three faculty members, none of whom were discussed in the OEO Report—started a campaign to promote other candidates over him in response to the survey.  *Id.* ¶ 176.  El Chaar received the most first-place and the most last-place rankings in the survey.  *Id.* ¶ 177.  In the narrative fields, some faculty "thought very highly of" El Chaar, and others wrote that he was "vindictive," "divisive," "narcissistic," and "bullies" faculty and residents.  *Id.*; *see* ECF No. 38-49.

On May 13, 2021, Bertolami offered the position of permanent chair to Leena Palomo, an external candidate, who accepted.  Def. 56.1 ¶¶ 185, 187.  Palomo was a tenured professor at Case Western Reserve University, and her professional memberships "suggested strong interpersonal skills, academic record, reputation and leadership."  *Id.* ¶ 182; *see* Bertolami Tr. at 139:15–22. Bertolami testified that El Chaar was passed over because he was not on a tenure track, had previously been rejected for promotion, and used terms like "friends" and "enemies" to describe faculty in the Department.  Def. 56.1 ¶ 183.  Bertolami stated that El Chaar was still a "very good second choice" and would have been appointed as permanent chair if Palomo turned down the job. *Id.* ¶¶ 183, 186.  El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and ranked El Chaar second.  *Id.* ¶ 181.  Bertolami testified that El Chaar "was our second choice" prior to the survey, and, that if in the survey "the faculty had strongly favored [El Chaar], we certainly would have reconsidered" the decision to choose Palomo.  Bertolami Tr. 156:12–15.  El Chaar alleges that, in a phone call on May 13, 2021, Bertolami said, "[T]he survey came back negative against [you].  And based on the survey, I cannot give you the position."  Pl. 56.1 ¶ 84; *see* Def. 56.1 ¶ 192.  Bertolami asked El Chaar to stay on as program director, but El Chaar resigned later that day.  Def. 56.1 ¶¶ 192, 195.

El Chaar brings this action, contending that he was (1) subjected to a hostile work environment; (2) denied promotion to the position of interim chair because of his OEO complaint; (3) denied promotion to the position of full-time chair both because of the survey—which he claims was infected with racial discrimination—and his OEO complaint; and (4) constructively discharged.  *See generally* Pl. Opp., ECF No. 45.[4]

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the nonmoving party has the ultimate burden of proof at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the nonmovant cannot produce admissible evidence that supports the existence of a dispute of material fact.  *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105.  "Although a party opposing summary judgment need not prove its evidence in a form admissible at trial or under the evidentiary

---

[4] On April 29, 2019, El Chaar's application for a promotion in rank from clinical associate professor to clinical professor was denied for reasons including a lack of scholarship.  Def. 56.1 ¶¶ 137, 141. Defendant also moves for summary judgment on El Chaar's claims regarding this denial.  *See* Def. Mem. at 14–15.  El Chaar did not respond in his opposition papers, and the Court deems this theory abandoned.

standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact exists." *Healy v. Chelsea Res. Ltd.*, 736 F. Supp. 488, 491–92 (S.D.N.Y. 1990) (citation omitted).  In deciding the motion, the Court views the record in the light most favorable to the nonmoving party.  *Koch*, 287 F.3d at 165.

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted).  That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct."  *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).  To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

## DISCUSSION

I.   <u>Hostile Work Environment</u>

A.  Legal Standard

For a § 1981 hostile work environment claim "[t]o survive summary judgment . . . , a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (quotation marks and citation omitted).  To determine if a workplace is hostile or abusive, courts "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

the victim's job performance." *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (cleaned up).

The statute of limitations is four years for § 1981 claims. *Banks*, 81 F.4th at 260. But, the "very nature" of hostile work environment claims "involves repeated conduct" that "collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 117 (2002). Therefore, as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. The earlier acts must be related to the act falling within the filing period such that they all are "part of the same unlawful employment practice." *Id.* at 122. And, the timely allegation cannot be a "discrete act of discrimination," such as an employee's termination. *Murillo-Roman v. Pension Boards – United Church of Christ*, No. 22 Civ. 8365, 2024 WL 246018, at *7 (S.D.N.Y. Jan. 23, 2024).

B. Analysis

As an initial matter, the Court must decide which acts it can consider for El Chaar's hostile work environment claim. El Chaar filed his lawsuit in state court on October 6, 2021. ECF No. 2. Therefore, he can rely on conduct that occurred after October 6, 2017, for his § 1981 claim. El Chaar does not dispute that the Report Acts occurred before that date and cannot form the basis for a timely claim under § 1981.[5] *See* Pl. Opp. at 23–26. However, he contends that the Report Acts are still actionable because he was subjected to acts within the limitations periods that were part of the same hostile work environment. The Court disagrees.

El Chaar first argues that the Report Acts continued because the training in response to the Report Acts was "generic" and "not tailored to the specific racist harassment [he] experienced." Pl.

---

[5] El Chaar filed his OEO complaint in August 2017, and neither OEO nor El Chaar indicate that any of the Report Acts occurred after El Chaar's filing of the OEO complaint.

Opp. at 24. "[A] failure to intervene can constitute actual participation in a hostile work environment." *Tromblee v. N.Y. State Off. for People with Dev. Disabilities*, No. 19 Civ. 638, 2023 WL 2655471, at *15 (N.D.N.Y. Mar. 27, 2023). But, "[a]n employer cannot be subject to a hostile work environment claim . . . if the employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct." *Russell v. N.Y.U.*, 739 F. App'x 28, 30 (2d Cir. 2018) (cleaned up); *see Morgan*, 536 U.S. at 118 (noting that "intervening action by the employer" can interrupt a hostile environment claim). Bertolami consulted the OEO investigator who authored the OEO Report and followed the investigator's recommendation that the training was the appropriate remedy. Def. 56.1 ¶¶ 110–12; *see Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16 Civ. 4897, 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017), *R. & R. adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017) (taking into account whether the defendant "attempted to remedy" the conduct in the statute-of-limitations analysis). Although El Chaar makes the claim that the training was "generic," he offers no evidence that it was inadequate. Therefore, the purportedly deficient training cannot alone make the Report Acts timely.

El Chaar next claims that other faculty members continued to call him anti-Semitic solely because of his national origin, and argues that these incidents are part of the same course of conduct as the Report Acts. Pl. Opp. at 25. But, El Chaar has adduced no admissible evidence that these post-OEO Report incidents occurred. Although El Chaar's July 20, 2019 letter to Sigurdsson stated that Warren and Bloom, against whom he had lodged his OEO complaint, called him anti-Semitic, he did not indicate when this incident occurred—and still does not. *See Def. 56.1 ¶ 151; Pl. 56.1 ¶¶ 52–53. El Chaar separately claims that a lab technician and a colleague told him that others in the Department had called him anti-Semitic. Pl. Opp. at 25; *see Pl. 56.1 ¶¶ 60–61. Hearsay statements such as this are inadmissible for the truth of the matter and, therefore, cannot be considered at

summary judgment.[6]  *See Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020).

Even if the Court were to consider these hearsay statements, El Chaar has not established that they were indeed part of the same course of conduct as the Report Acts.  The persons who allegedly called El Chaar anti-Semitic were not those named in the OEO report.  *Compare* ECF No. 44-16 (lab technician text message) *and* Pl. 56.1 ¶ 61 (colleague statement) *with* OEO Report at 20–21; *see Grimes-Jenkins*, 2017 WL 2258374, at *13 (refusing to consider allegations that "involve[d] distinct conduct by a number of different coworkers and supervisors" as part of the same employment practice).  And, in the recorded Zoom meeting, El Chaar told Bertolami that his relationship with the faculty was positive and that he had made peace with Warren, whom he called "the main instigator." *See* ECF No. 44-19 at 27:10–23, 29:19–23.

El Chaar's hostile work environment claim, therefore, rises or falls based on acts that occurred during the applicable limitations periods.  Aside from the alleged instances when certain faculty members called El Chaar anti-Semitic, which are inadmissible,[7] El Chaar points only to Bertolami's use of a faculty survey during the hiring process for the permanent chair.  Pl. Opp. at 27.  The survey relates to an alleged "discrete act of discrimination," namely a failure to promote, *see infra* Section II.C, and is, therefore, not properly considered as part of the hostile work environment claim. *Murillo-Roman*, 2024 WL 246018, at *7.  And, to the extent that El Chaar challenges the statements made in survey responses, he does not indicate that any were motivated by race or national-origin

---

[6] Plaintiff does not respond to Defendant's hearsay objection in his opposition papers or indicate that the cited materials could "be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned" (cleaned up)).

[7] Even if the Court were to consider the hearsay statements, El Chaar does not make out a hostile work environment claim.  The hearsay statements are too isolated to constitute "severe and pervasive" conduct in violation of § 1981.  *See Sykes v. Rachmuth*, No. 22 Civ. 3989, 2023 WL 2752865, at *7 (S.D.N.Y. Mar. 31, 2023) ("Isolated incidents or episodic stray remarks are not sufficiently continuous and concerted in order to be deemed pervasive." (quotation marks and citation omitted)).

discrimination.  *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 121 (S.D.N.Y. 2022) (granting summary judgment when plaintiff "offered a laundry list of facially neutral allegations" and did not "present any evidentiary basis to infer that the incidents alleged were . . . animated by discriminatory intent" (cleaned up)).

Accordingly, Defendant's motion for summary judgment is GRANTED as to the hostile work environment claim under Section 1981.

II.   <u>Discrete Acts</u>

A.  Legal Standard

Employment discrimination and retaliation claims under § 1981 are "governed at the summary judgment stage by the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)."  *Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Civ. 10256, 2023 WL 2049800, at *19–20, 24 (S.D.N.Y. Feb. 16, 2023) (quotation marks and citation omitted).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of either discrimination or retaliation.  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (discrimination); *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (retaliation).  To state a prima facie case of discrimination under § 1981, a plaintiff must show: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  To make a prima facie case of retaliation under § 1981, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 316.

The burden then shifts to the defendant to offer a legitimate non-discriminatory or non-retaliatory reason for its actions. *Abrams*, 764 F.3d at 251 (discrimination); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (retaliation). Defendant can meet this burden "by introducing admissible evidence establishing a non-discriminatory [or non-retaliatory] rationale which, if believed by the trier of fact, would support the finding that race discrimination [or retaliation] did not underlie the adverse employment act." *Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556, 573 (S.D.N.Y. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

If the defendant succeeds, the burden shifts back to the plaintiff to "establish that the defendant's reason is in fact pretext for unlawful discrimination," *Abrams*, 764 F.3d at 251, or that "retaliation was a substantial reason for the complained-of action," *Fincher*, 604 F.3d at 720. At the third step of the *McDonnell Douglas* framework, the Court "examine[s] the entire record, using a case-specific approach, to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff." *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 650 (2d Cir. 2020) (cleaned up).

### B. Failure to Appoint as Interim Chair

El Chaar contends that Bertolami did not appoint him as interim chair in retaliation for the OEO complaint. Pl. Opp. at 14–16. El Chaar has made out a prima facie case of retaliation. He participated in a protected activity by complaining to OEO about racial discrimination. *Fenner v. News Corp.*, No. 09 Civ. 9832, 2013 WL 6244156, at *24 (S.D.N.Y. Dec. 2, 2013) (protecting both "formal complaint[s]" and informal "complaints to management"). Bertolami knew about the protected activity. *See* Def. 56.1 ¶¶ 110–12. El Chaar suffered an adverse employment action: he was not promoted. *Feliciano v. City of New York*, No. 14 Civ. 6751, 2015 WL 4393163, at *11 (S.D.N.Y. July 15, 2015) ("[The plaintiff] undisputedly experienced an adverse employment action when he was denied promotion."). And, El Chaar's testimony that Bertolami told him, "You

14

complained to OEO, and we needed a cooling period," establishes a causal connection between the adverse action and his alleged retaliation. *See id.* at 12 (holding that the supervisor's reference to the plaintiff's lawsuits in explaining why he did not get an interview "bespoke that [the plaintiff's lawsuits] had played some role in the [employer's] reasons for not promoting him").

The burden then shifts to Defendant to articulate a legitimate, nonretaliatory basis for the failure to appoint El Chaar as the interim chair. *Early*, 603 F. Supp. 2d at 573. Here, Defendant has met its burden. Interim chairs were "routinely" appointed at NYU Dentistry, and these chairs were typically "experienced administrator[s] . . . [with] no intention of applying for the permanent position." Def. 56.1 ¶¶ 116–17. An interim chair's role is to "evaluate the department for the Dean, make improvements, resolve conflicts and rebuild." *Id.* ¶ 116. An interim chair had previously been appointed to oversee the Department from 2010 to 2012 for these very reasons. *Id.* ¶¶ 32–35; Bertolami Tr. at 59:6–15.

El Chaar does not dispute that, when Sigurdsson was appointed, the Department was "fractious" and faced issues with "(1) patient complaints, (2) concerns with the rigorousness of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues." *Id.* ¶ 126. Bertolami installed Sigurdsson to "improve the situation in the Department to maximize the number of excellent candidates who would apply for the permanent position." *Id.* ¶ 129. Given the problems afflicting the Department, Sigurdsson's appointment follows NYU Dentistry's established pattern for appointing interim chairs from outside the department. *See* Def. 56.1 ¶¶ 117–19; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (holding that "consistency" supports the "proffered nondiscriminatory reason").

The burden shifts back to El Chaar to provide "facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that the legitimate reasons offered . . . were a pretext for retaliation." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) (summary order)

(cleaned up).  Under § 1981, a plaintiff alleging retaliation "must show that retaliation was a 'but-for' cause of the adverse action," in other words, "that the adverse action would not have occurred in the absence of the retaliatory motive."  *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered" reasons.  *Id.*  To show that the reason for his employer's refusal to promote him was pretextual, the plaintiff must show by a preponderance of the evidence that the employer's justifications "were not its true reasons, but were a pretext for discrimination [or retaliation]." *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008) (citation omitted).

El Chaar has admitted that the Department was fractious.  Def. 56.1 ¶ 126; *see Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 689 (S.D.N.Y. 2020) (faulting the plaintiff for not showing that the defendant's proffered reason was false).  And, he does not suggest that "his credentials were so superior . . . that no reasonable person could have chosen [Sigurdsson] over" him.  *Gonzalez*, 442 F. Supp. 3d at 690.

El Chaar again points to his testimony about Bertolami saying—near the time of Sigurdsson's appointment—that the Department needed a cooling-off period due to El Chaar's OEO complaint. Pl. 56.1 ¶ 42.  At the summary-judgment stage, the Court is bound to accept El Chaar's version of his conversation with Bertolami, and, standing alone, it could suggest that the "legitimate reasons offered by the defendant[] were not [its] true reasons."  *Cardwell*, 2023 WL 2049800, at *36.

But, the question at summary judgment is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010).  Here, this one comment is insufficient to meet El Chaar's burden

16

to show but-for causation, given the admitted problems in the Department and the common practice of appointing interim chairs. *Id.* at 726–27 (holding that an "offhand" remark offers a "scintilla of evidence" in support of pretext but, without "further support in the record," is not sufficient for a jury to find that a supervisor's comment was made with a discriminatory motive). Moreover, other evidence in the record weakens the inference that this comment demonstrates a retaliatory motive. Bertolami said in the surreptitiously recorded Zoom meeting that "[o]ther people" needed a cooling-off period, not El Chaar. ECF No. 44-19 at 14:1–15:10; *see also* Bertolami Tr. at 116:13–23. Indeed, Bertolami said that he appointed an interim in part to help El Chaar's chances of becoming the permanent chair, ECF No. 44-19 at 12:22–13:1, 14:1–6, and El Chaar does not dispute that Bertolami was ready to give him the job in 2020 if Sigurdsson had decided to move on before a permanent chair could be appointed, Def. 56.1 ¶ 153. And, although Bertolami referenced the OEO complaint, he did not suggest that El Chaar did anything wrong by filing it. *Cf. Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 1051, 2020 WL 1528101, at *9 (S.D.N.Y. Mar. 31, 2020) (denying summary judgment when supervisor told the plaintiff that he was a "troublemaker" and asked him if there was anything he regretted).

El Chaar also claims that Bertolami denied him the position because Bertolami understood the OEO Report to be holding El Chaar partially responsible for the Department's "fractious" state. Pl. Opp. at 16. Retaliation requires the filing of a complaint to be the "but-for" cause of the adverse action. Even if Bertolami interpreted the OEO Report as holding El Chaar responsible, *see* ECF No. 44-3 at 2, that alone does not demonstrate a retaliatory motive unless El Chaar can show that Bertolami held this interpretation because El Chaar filed the OEO complaint. El Chaar has offered no such evidence.

Accordingly, El Chaar has not shown that retaliation was the but-for cause of the decision not to appoint him as interim chair, dooming his retaliation claim as to this discrete act under § 1981.

SPA-18

C.  Failure to Appoint as Permanent Chair

El Chaar next contends that the failure to appoint him as the permanent chair in 2021 was both discriminatory and retaliatory.  Pl. Opp. at 16–18, 26–27.

1.  Discrimination

The Court first examines whether El Chaar has made a prima facie case of discrimination. The first three prongs are not contested: El Chaar is a member of a protected class, was qualified for the position of permanent chair, and was denied the position.

The fourth prong is whether the denial "occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at 150.  El Chaar argues that there is an inference of discrimination because Bertolami used a survey during the interview process.  Pl. Opp. at 26–27.  El Chaar points to Bertolami's statement that determining "whether or not the faculty in [p]eriodontology would be willing to be led by [] El Chaar . . . is what motivated the survey."  Pl. 56.1 ¶ 81.  And, Bertolami allegedly told El Chaar, "[B]ased on the survey, I cannot give you the position."  Pl. 56.1 ¶ 84.  According to El Chaar, Bertolami's use of and deference to the survey allowed "the same faculty who had tormented him for years based on his race and national origin" to "prevent [] El Chaar from being promoted to [c]hair."  Pl. Opp. at 26–27.

Courts in this Circuit have recognized that a decisionmaker who is not biased can be a "conduit of the subordinates' improper motives," if he "'rubber stamps' the recommendation of [biased] subordinates."  *Fullard v. City of New York*, 274 F. Supp. 2d 347, 357 (S.D.N.Y. 2003) (citations and quotation marks omitted)).  This form of liability is called "cat's paw liability," *id.*, or a "poisoning the well" theory, *Balk v. N.Y. Inst. of Tech.*, 683 F. App'x 89, 94 (2d Cir. 2017); *see id.* ("If [the] source of input for [an] employment decision was in fact polluted by racial bias, that might be enough to poison the well of the manager's decision even if he were wholly innocent of such a bias on his part." (cleaned up and emphasis omitted)).

18

SPA-19

But, for Bertolami to be a "conduit," El Chaar must demonstrate that the survey responses "themselves were the product of discriminatory or retaliatory intent." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016). He has not. The survey responses do not, on their face, indicate bias. *See* ECF No. 38-49. It is true that evidence of bias is rarely stated directly. *See Gallo v. Prudential Res. Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). But, El Chaar has not adduced additional evidence that the survey responses were motivated by discriminatory attitudes about his race or national origin. El Chaar merely claims that Tang, Wayne Kye, and Roya Mohajer—three faculty members, none of whom were discussed in the OEO Report—started a campaign against him in response to the survey, Def. 56.1 ¶ 176, but does not offer evidence that the campaign had something to do with his race or national origin.[8]

Moreover, an employer is not liable "simply because it acts on information provided by a biased co-worker"; rather, the employer "adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outside role in its own employment decision." *Vasquez*, 835 F.3d at 275 (emphasis in original). El Chaar has not demonstrated that Bertolami acted negligently in considering the survey responses: El Chaar told Bertolami in the Zoom meeting that El Chaar's relationship with the Department was "positive" and that he had made peace with "the main instigator." *See* ECF No. 44-19 at 27:10–23, 29:19–23. Moreover, as stated above, the survey responses did not, on their face, indicate bias so as to arouse Bertolami's suspicion of unlawful conduct.

Even if the Court were to assume that El Chaar could make out a prima facie case, Defendant has offered legitimate, non-discriminatory reasons both for using the survey and for denying El

---

[8] Indeed, El Chaar admits that he and Tang had continuing interpersonal conflicts that prompted his July 20, 2019 letter to Sigurdsson seeking to have her removed from the Department, and does not claim that these conflicts were motivated by his race or nationality. *See* Def. 56.1 ¶¶ 149–52.

Chaar's promotion, and El Chaar cannot show that these reasons were pretextual. *Cardwell*, 2023 WL 2049800, at *20.

As for the survey, Defendant states that Bertolami regularly elicited feedback from department faculty before appointing a chair to lead them. Def. 56.1 ¶¶ 172, 174, 178. El Chaar does not dispute that Bertolami sought "a consensus builder; and someone very good at interpersonal relationships." *Id.* ¶ 169. A survey of the Department would help Bertolami assess those qualities, similar to the listening tours that Bertolami had conducted for other NYU Dentistry chairs. *Id.* ¶ 179. Bertolami also said that the survey was created in response to El Chaar's interview statement that he would fire four or five colleagues if he were to become the permanent chair, which raised doubts about El Chaar's "capacity for leadership" and the veracity of his claim that his relationship with the faculty was "positive," as he had stated in the Zoom meeting. Bertolami Tr. at 163:16–25. Assessing whether a person has "the judgment needed for the role" is a legitimate, non-discriminatory motive. *Fleming*, 371 F. App'x at 117.

El Chaar argues that these reasons were pretextual because Bertolami knew that the surveyed persons held discriminatory beliefs. But, El Chaar told Bertolami that his relationship with the Department was "positive." Of the three people named in the OEO Report, El Chaar's relationship with Bloom remained poor, but Loomer—the former chair—had departed, and El Chaar said that he made peace with Warren. The survey was sent to 77 faculty members, and Bertolami's decision to use a survey, even if he knew that one or two people may have negative or even discriminatory beliefs about El Chaar, does not demonstrate that he was motivated by discrimination. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("We are interested in what *motivated* the employer." (citation and quotations marks omitted)).

El Chaar also contends that this was the first time that a written survey had been used to appoint a Department chair. Pl. 56.1 ¶ 78. "[D]epartures from procedural regularity . . . can raise a

question as to the good faith of the process where the departure may reasonably affect the decision." *Weinstock*, 224 F.3d at 45 (cleaned up and emphasis omitted).  But, NYU Dentistry had used written surveys before for other positions, Def. 56.1 ¶ 180, and Bertolami conducted listening tours for other high-level positions, *id.* ¶ 179.  Moreover, El Chaar concedes that the survey was written because of COVID-19 pandemic restrictions.  *Id.* ¶ 174.

As for the denial of the permanent chair position, Defendant claims that Palomo was more qualified than El Chaar based on Bertolami's criteria.  *See* Def. 56.1 ¶ 169.  El Chaar does not dispute that Bertolami wanted to appoint a "candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor."  *Id.*  An employer may base its decision on such subjective criteria, as long as it does not rely on a "vague or conclusory averment[] of good faith . . . that would not frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."  *Tucker v. N.Y. City*, 376 F. App'x 100, 102 (2d Cir. 2010) (citations and quotation marks omitted); *see Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e) ("An employer is entitled to arrive at a subject evaluation of a candidate's suitability for a position.").  Palomo was a tenured professor and a member of multiple professional organizations, which "suggested strong interpersonal skills, academic record, reputation and leadership."  *Id.* ¶ 182.  By contrast, although El Chaar was qualified, he was not on a tenure track, had been rejected for promotion, and called people within the Department "enemies."  *Id.* ¶ 183.  El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and El Chaar second.  *Id.* ¶ 181.  The Court concludes that Defendant has met its burden to proffer legitimate, nondiscriminatory reasons for choosing Palomo.

The burden, therefore, shifts to El Chaar to demonstrate that these reasons were pretextual. To show that the reason for his employer's refusal to promote him was pretextual, the plaintiff must show by a preponderance of the evidence that the employer's justifications "were not its true reasons, but were a pretext for discrimination." *Richardson*, 532 F.3d at 125 n.11 (citation omitted). El Chaar concedes that the reasons offered by Defendant in ranking him second were accurate: he was not on a tenure track, had been denied promotion, and had called people within the Department "enemies," while Palomo had both tenure and membership in professional organizations, which "suggested strong interpersonal skills, academic record, reputation and leadership." Def. 56.1 ¶¶ 181–83.

He argues, however, that these reasons understate the importance of the survey as evidenced by Bertolami allegedly stating that he could not give El Chaar the position "based on the survey." Pl. Opp. at 16–17. But, Bertolami's comment does not demonstrate that the reasons offered by Defendant hid discrimination. The survey was an explicit part of Bertolami's rationale: he testified that El Chaar "was our second choice" prior to the survey, and that if, in the survey, "the faculty had strongly favored [El Chaar], we certainly would have reconsidered" the decision to choose Palomo. Bertolami Tr. 156:12–15. And, as discussed above, El Chaar has neither shown that the survey responses were infected with racial discrimination nor that Bertolami acted negligently in considering them. Therefore, Bertolami's consideration of the survey does not render his reasons for choosing Palomo a pretext for racial discrimination.

Second, El Chaar disputes Defendant's reliance on Palomo's tenure, which he says was not a requirement for the position. Pl. Opp. at 16. But, Defendant does not claim that tenure was a requirement; indeed, El Chaar, despite not having tenure, would have been offered the position had Palomo declined. *Id.* ¶ 186. Tenure is plausibly relevant to whether the candidate had an "outstanding academic record," *id.* ¶ 169, and Bertolami's consideration of Palomo's tenure does not undermine the proffered rationale. *See Fleming*, 371 F. App'x at 118 ("Only where an employer's

business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

Accordingly, El Chaar has not demonstrated that Defendant discriminated against him on the basis of race or national origin in conducting the survey and selecting Palomo.

2.   Retaliation

El Chaar argues that he was denied the permanent chair position in retaliation for his OEO complaint.  The causal inference in his prima facie case is weaker, as over three years had passed between his OEO complaint and Palomo's selection as chair.  *See Doe v. City of New York*, No. 22 Civ. 6898, 2023 WL 4624692, at *3 (S.D.N.Y. July 19, 2023).  But, even if the Court were to assume that El Chaar could make a prima facie case, his claim fails for the same reasons as his discrimination claim.  Defendant has offered a legitimate, non-retaliatory rationale for selecting Palomo, and El Chaar has not demonstrated that its reasons were pretextual.

Accordingly, El Chaar has not shown that retaliation played a role in the denial of the permanent chair appointment, so his retaliation claim fails.

III.   Constructive Discharge

Under federal law, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003).  "Such a claim requires the employee to show both [1] that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and [2] that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Pompey-Primus v. Success Acad. Charter Schs., Inc.*, No. 21 Civ. 3981, 2022 WL 504541, at *4 (S.D.N.Y. Feb. 17, 2022) (quoting *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017)).  The inquiry is objective. *Pa. State Police v. Suders*, 542

U.S. 129, 141 (2004).  The standard is "demanding."  *Pollock v. Shea*, 568 F. Supp. 3d 500, 513 (S.D.N.Y. 2021).  A "reduction in responsibilities" is not sufficient to make out such a claim.  *Tulino v. City of N.Y.*, 813 F. App'x 725, 727 (2d Cir. 2020) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004)).  Nor is unfair criticism, *Catania v. NYU Langone Health Sys.*, No. 22 Civ. 4362, 2022 WL 17539121, at 4 (S.D.N.Y. Dec. 5, 2022), or the "denial of promotion by itself."  *Spires v. MetLife Grp., Inc.*, No. 18 Civ. 4464, 2019 WL 4464393, at *10 (S.D.N.Y. Sept. 18, 2019).

El Chaar's constructive-discharge claim is insufficient as a matter of law.  El Chaar does not demonstrate that Bertolami or any other supervisor deliberately sought to create an intolerable work environment; indeed, Bertolami sought to have El Chaar continue in his position as program director, which carried with it significant managerial responsibilities.  Def. 56.1 ¶ 192; *see Pollock*, 568 F. Supp. 3d 514 (noting that supervisor "indicating that he understood [plaintiff]'s frustration and hoped that she would remain" with the employer cut against a constructive-discharge finding).  El Chaar also claims that his complaints of discrimination and retaliation were not taken seriously, but in addition to creating the OEO Report, Defendant ensured that no persons on the search committee for chair were faculty "who had a history of conflict with Plaintiff."  Def. 56.1 ¶ 160.  El Chaar's threats to resign if he were not made the chair, *id.* ¶¶ 189–90, state a "dissatisfaction with job assignments," which is "simply insufficient to establish the sort of intolerable working conditions necessary to a constructive discharge claim."  *Antrobus v. N.Y.C. Health & Hosps. Corp.*, No. 19 Civ. 7449, 2021 WL 964438, at *15 & n.14 (S.D.N.Y. Mar. 15, 2021).

IV.    State Law

Finally, El Chaar brings claims under the NYSHRL and the NYCHRL.  Compl. ¶¶ 64–89. Having granted summary judgment to Defendant on El Chaar's federal claims, the Court declines to exercise supplemental jurisdiction over his state-law claims.  *See* 28 U.S.C. § 1367(c)(3); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("[W]here the federal claims are dismissed before trial,

SPA-25

the state claims should be dismissed as well."). Accordingly, those claims are DISMISSED without prejudice to renewal in state court.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to El Chaar's federal claims, and El Chaar's state claims are DISMISSED without prejudice to renewal in state court. The Clerk of Court is directed to enter judgment for Defendant consistent with this order, terminate the motion at ECF No. 36, and close the case.

SO ORDERED.

Dated: March 28, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge

SPA-26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
DR. EDGARD EL CHAAR,

                    Plaintiff,

        -against-                             22 **CIVIL** 00856 (AT)

                                                <u>**JUDGMENT**</u>

NEW YORK UNIVERSITY COLLEGE OF
DENTISTRY

                    Defendant.
--------------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Order dated March 28, 2024, Defendant's motion for summary judgment is

GRANTED as to El Chaar's federal claims, and El Chaar's state claims are DISMISSED without

prejudice to renewal in state court. Judgment entered for Defendant consistently with the Order,

and the case is closed.

**Dated:**  New York, New York

      March 29, 2024

                                      **RUBY J. KRAJICK**
                                      **Clerk of Court**

                    **BY:**

                               _____
                                      **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $605 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* Please see District Court fee schedule at https://www.nysd.uscourts.gov/programs/fees. If you are unable to pay the $605 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY  10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY  10601-4150

Rev. 5/23/14

SPA-28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (    )(    )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the        ☐ judgment    ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____        _____

Dated                           Signature*

_____

Name (Last, First, MI)

_____

Address                City            State            Zip Code

_____        _____

Telephone Number                E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-29

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                            **MOTION FOR EXTENSION
                                                     OF TIME TO FILE NOTICE
                                                     OF APPEAL**
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                              date

time period because:


_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____          _____
Dated:                                    Signature

_____          _____
Name (Last, First, MI)

_____
Address                        City              State              Zip Code

_____          _____
Telephone Number                          E-mail Address (if available)


Rev. 3/27/15

SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____    _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-    **MOTION FOR LEAVE TO
PROCEED IN FORMA
PAUPERIS ON APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____    _____
Dated    Signature

_____
Name (Last, First, MI)

_____
Address    City    State    Zip Code

_____    _____
Telephone Number    E-mail Address (if available)

Rev. 12/23/13

SPA-31

## Application to Appeal In Forma Pauperis

_____**v.** _____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br> Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br> Date: _____ |

My issues on appeal are: (underline)required):

1.  *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

SPA-32

| Interest and dividends | $ | $ | $ | $ |
|---|---|---|---|---|
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

- 2 -

SPA-33

4.    *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

SPA-34

6.  *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.  *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.  *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>     Are real estate taxes included? ☐ Yes ☐ No<br>     Is property insurance included? ☐ Yes ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9.    *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    ☐ Yes        ☐ No        If yes, describe on an attached sheet.

10.    *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

    *If yes, how much?* $ _____

SPA-36

11.   *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.   *Identify the city and state of your legal residence.*

   City _____   State _____

   Your daytime phone number: _____

   Your age: _____   Your years of schooling: _____

   Last four digits of your social-security number: _____

   Print     Save     Reset Form

- 6 -