# 24-1169-CV

## United States Court of Appeals

*for the*

## Second Circuit

———————————

DR. EDGARD EL CHAAR,

*Plaintiff-Appellant,*

– v. –

NEW YORK UNIVERSITY COLLEGE OF DENTISTRY,

*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

SUSAN D. FRIEDFEL
POONAM SETHI
JACKSON LEWIS P.C.
*Attorneys for Defendant-Appellee*
44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-8060

CP COUNSEL PRESS     (800) 4-APPEAL • (333881)

## DEFENDANT-APPELLEE'S RULE 26.1
## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee New York University i/s/h/a New York University College of Dentistry, is not publicly traded and does not have a publicly traded parent corporation.

Respectfully submitted,

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
914-872-8060

By: _____
Susan D. Friedfel
Poonam Sethi
*ATTORNEYS FOR*
*DEFENDANT-APPELLEE*

Dated:        October 30, 2024
              White Plains, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF JURISDICTION ..................................................... 3

COUNTER-STATEMENT OF ISSUES ............................................... 4

COUNTER-STATEMENT OF FACTS ................................................. 4

    I.     THE PARTIES ................................................................. 4

          A.    NYU College of Dentistry and the Department of Periodontology and Implant Dentistry ........................ 4

          B.    Dr. El Chaar ............................................................. 5

    II.    APPELLANT'S HOSTILE WORK ENVIRONMENT CLAIM IS BASED ON SPORADIC COMMENTS AND A MYRIAD OF INTERPERSONAL CONFLICTS NOT BASED ON RACE OR NATIONAL ORIGIN ................................... 6

    III.   DR. EL CHAAR WAS NOT APPOINTED CHAIR BECAUSE HE WAS NOT THE BEST CANDIDATE ..................... 12

          A.    History and Process of Appointing Department Chairs .......... 12

          B.    Pursuant to NYU's Routine Operating Procedure, After Dr. Loomer Resigned, an Interim Chair Was Appointed ......... 15

          C.    Dr. El Chaar Was Not Appointed Chair Because He Was Not the Best Candidate ..................................... 16

SUMMARY OF ARGUMENT ........................................................... 20

STATEMENT OF STANDARD OF REVIEW AND SUMMARY JUDGMENT STANDARD ................................................................. 23

ARGUMENT ................................................................................... 25

    I.    DR. EL CHAAR CANNOT CREATE A FACTUAL DISPUTE WHERE THERE IS NO ADMISSIBLE EVIDENCE TO SUPPORT HIS CLAIMS ........................ 25

A.    The District Court Did Not Make Impermissible Credibility Assessments ........................................................ 26

II.    DR. EL CHAAR FAILED TO ESTABLISH RETALIATION AS A MATTER OF LAW ............................................... 28

A.    The District Court Correctly Determined that NYU Did Not Retaliate against Dr. El Chaar in Not Appointing Him as Interim Chair ................................................... 29

B.    The District Court Correctly Determined that NYU Did Not Retaliate against Dr. El Chaar in Not Appointing Him as Permanent Chair .......................................... 32

III.    DR. EL CHAAR FAILED TO ESTABLISH A HOSTILE WORK ENVIRONMENT CLAIM AS A MATTER OF LAW ....................................................................... 39

A.    The Alleged Conduct and Comments Do Not Support a Finding of a Policy or Practice of Discrimination .................. 40

B.    The District Court Properly Dismissed Dr. El Chaar's Allegations Arising before October 6, 2017 as Time-Barred ........................................................................ 49

CONCLUSION ........................................................................... 52

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Accely v. Consol. Edison Co. of N.Y.*,
  2023 U.S. Dist. LEXIS 69699 (S.D.N.Y. Apr. 20, 2023) ...................................41

*Alvarado v. Nordstrom, Inc.*,
  685 F. App'x 4 (2d Cir. 2017) ........................................................ 40, 41

*Bacchus v. N.Y. City Dept. of Educ.*,
  137 F. Supp. 3d 214 (E.D.N.Y. 2015) ..............................................47

*Banks v. GM, LLC*,
  81 F.4th 242 ...........................................................................40

*Batista v. Waldorf Astoria*,
  2015 U.S. Dist. LEXIS 94023 (S.D.N.Y. July 20, 2015) ...................................41

*Bright v. Coca-Cola Refreshments USA, Inc.*,
  2014 U.S. Dist. LEXIS 155565 (E.D.N.Y. Nov. 3, 2014) ..................... 40, 44, 47

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011) ......................................................23

*Chudnovsky v. Prudential Sec. Inc.*,
  2000 U.S. Dist. LEXIS 15401 (S.D.N.Y. Oct. 13, 2000) ...................................50

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001) ...............................................................32

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) ......................................................24

*Davis-Bell v. Columbia Univ.*,
  851 F. Supp. 2d 650 (S.D.N.Y. 2012) .............................................44

*Delaney v. Bank of Am. Corp.*,
  766 F.3d 163 (2d Cir. 2014) ......................................................23

*Dister v. Grp. Continental, Inc.*,
  859 F.2d 1108 (2d Cir. 1988) .....................................................24

*Eastman Kodak Co. v. STWB, Inc.*,
  452 F.3d 215 (2d Cir. 2006) ......................................................41

*Fattoruso v. Hilton Grand Vacations Co.*,
  873 F. Supp. 2d 569 (S.D.N.Y. 2012) ................................................42

*Fleming v. MaxMara USA, Inc.*,
  371 F. App'x 115 (2d Cir. 2010) ................................................ 36, 37

*Free Holdings, Inc. v. McCoy*,
  No. 23-644, 2024 U.S. App. LEXIS 1045 (2d Cir. Jan. 17, 2024) .....................34

*Gachette v. Metro N.-High Bridge*,
  722 F. App'x 17 (2d Cir. 2018) ................................................28

*Harris v. S. Huntington Sch. Dist.*,
  No. 06-CV-3879 (DGT), 2009 U.S. Dist. LEXIS 27392
  (E.D.N.Y. Mar. 30, 2009) ................................................48

*Jimenez v. City of N.Y.*,
  605 F. Supp. 2d 485 (S.D.N.Y. 2009) ................................................30

*Johnson v. City of N.Y.*,
  No. 17-CV-7585 (PKC) (RER), 2019 U.S. Dist. LEXIS 160198
  (E.D.N.Y. Sep. 18, 2019) ................................................45

*Karimian v. Time Equities, Inc.*,
  569 F. App'x 54 (2d Cir. 2014) ................................................31

*Knight v. Nassau Cnty.*,
  852 F. App'x 42 (2d Cir. 2021) ................................................28

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
  731 F.3d 199 (2d Cir. 2013) ................................................23

*Little v. NBC*,
  210 F. Supp. 2d 330 (2d Cir. 2010) ................................................49

*Lunts v. Rochester City Sch. District*,
  515 F. App'x 11 (2d Cir. 2013) ................................................24

*Malik v. City of New York*,
  841 F. App'x 281 (2d Cir. 2021) ................................................25

*Maria v. Massachusetts Inst. of Tech.*,
  No. 1:22-cv-10959 (ALC) (SN), 2024 U.S. Dist. LEXIS 176972
  (S.D.N.Y. Sep. 30, 2024) ................................................ 45, 49

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................28

iv

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) ..................................................24

*Millea v. Metro-North R.R.*,
  658 F.3d 154 (2d Cir. 2011) .................................................41

*Monterosso v. Sullivan & Cromwell, LLP*,
  591 F. Supp. 2d 567 (S.D.N.Y. 2008) ....................................51

*Murillo-Roman v. Pension Bds.*,
  No. 1:22-cv-08365 (JLR), 2024 U.S. Dist. LEXIS 12128
  (S.D.N.Y. Jan. 23, 2024) .....................................................45

*Ochei v. Mary Manning Walsh Nursing Home Co.*,
  2011 U.S. Dist. LEXIS 20542 (S.D.N.Y. Mar. 1, 2011)...............50

*Palmer v. Cook*,
  65 Misc. 3d 374 (Sup. Ct., Queens Cnty. 2019)......................51

*Quoka v. City of W. Haven*,
  64 F. App'x 830 (2d Cir. 2003).............................................44

*Richardson v. Comm'n on Hum. Rts. & Opportunities*,
  532 F.3d 114 (2d Cir. 2008) .................................................28

*Rivera v. JP Morgan Chase*,
  815 F. App'x 603 (2d Cir. 2020) ...........................................43

*Robinson v. Concentra Health Services, Inc.*,
  781 F.3d 42 (2d Cir. 2015) ...................................................23

*Rojas v. R.C. Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011) ...................................................27

*Ruiz v. Cty. of Rockland*,
  609 F.3d 486 (2d Cir. 2010) .................................................28

*Ruiz v. SEIU Loc. 32BJ*,
  No. 19 Civ. 8810 (PAE) (KHP), 2023 U.S. Dist. LEXIS 132992
  (S.D.N.Y. Apr. 17, 2023) .....................................................39

*Russell v. N.Y. Univ.*,
  739 F. App'x 28 (2d Cir. 2018)..............................................49

*Tucker v. New York City*,
  376 F. App'x 100 (2d Cir. 2010) ...........................................36

*Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global LLC*,
No. 21-2059-cv, 2022 U.S. App. LEXIS 18651 (2d Cir. July 7, 2022)...............20

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) ........................................................................30

*Windward Bora LLC v. Sotomayor*,
113 F.4th 236 (2d Cir. 2024) ....................................................................34

*Woodworth v. Shinseki*,
447 F. App'x 255 (2d Cir. 2011) ..............................................................32

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ......................................................................................3

28 U.S.C. § 1331 ......................................................................................3

28 U.S.C. § 1367 ......................................................................................3

42 U.S.C. § 1981 ............................................................................. *passim*

Fed. R. Civ. P. 56 ....................................................................................1

Fed. R. Civ. P. 56(c)(2) ..........................................................................25

Fed. R. Civ. P. 56(e)(2) ..........................................................................20

Fed. R. Civ. P. 56(e)(3) ..........................................................................20

New York Executive Law § 290 ..............................................................3

## PRELIMINARY STATEMENT

This is an appeal by Plaintiff-Appellant Dr. Edgard El Chaar ("Appellant" or "Dr. El Chaar") from a Judgment dated March 29, 2024 which was issued by the United States District Court for the Southern District of New York. (SA-26).[1] The Judgment is based on the March 28, 2024 Opinion and Order of Hon. Analisa Torres, United States District Judge, granting Defendant-Appellee New York University's ("NYU" or "Appellee") motion for summary judgment pursuant to Fed. R. Civ. Pro. 56 and dismissing Dr. El Chaar's federal causes of actions alleging hostile work environment harassment based on race and national origin discrimination and retaliation in violation of 42 U.S.C. § 1981 ("§ 1981"). (S.P.A. 1).

Dr. El Chaar's claim of retaliation largely results from his inability to recognize that the leadership of the NYU College of Dentistry had priorities and considerations that went beyond Dr. El Chaar's desire to be Chair of the Department of Periodontology and Implant Dentistry (the "Department") and his disappointment with not being anointed Chair. The Dean of NYU College of Dentistry decided, as he had repeatedly in connection with other chair vacancies, to ask an experienced department chair from outside the Department to serve as Interim Chair, provide him an assessment of the state of the Department, and address any significant operational

---

[1] Pages from the Special Appendix filed by Appellant are referenced herein as "(S.P.A. ____)." Pages from the Appendix are referenced herein as "(A. ____)." Pages from Special Appendix filed by Appellee are referenced herein as "(S.A. ____)."

issues to ensure that the position would be desirable before beginning a search for a permanent Chair. The decision was, in part, motivated by a desire to ensure that Dr. El Chaar could put himself in the best possible position for success to be selected as Chair through the search process. When the time was appropriate, a search committee was appointed and recommended four finalists. Although Dr. El Chaar was a finalist and the Dean's second choice of the four finalists, he was not ultimately selected for the position because he was not the most qualified candidate. Neither Dr. El Chaar's race or national origin nor his prior complaint of harassment, was a factor in the process to select a chair. As set forth herein, even when crediting all factual inferences that could rationally be drawn in Dr. El Chaar's favor, the appellate record does not support a reasonable inference that Dr. El Chaar's race or national origin played any role in NYU's decision not to select Dr. El Chaar as chair, interim or otherwise.

Dr. El Chaar's claims of hostile work environment harassment based on race and national origin discrimination are largely premised on offensive comments allegedly made to him in or before 2013, which is more than four years outside the statute of limitations. To the extent he alleges any conduct during the limitations period, he cannot present any admissible evidence to support such allegations; instead he relies on inadmissible hearsay, which is patently insufficient. Dr. El Chaar persists in his effort to rely on time-barred factual allegations of comments allegedly

made prior to his one-year break in service. These allegations are far too disconnected from any alleged events during the limitations period to possibly be considered part of a "continuing violation" or in furtherance of policy of discrimination.

Thus, the District Court correctly held that, even when resolving all ambiguities and drawing all factual inferences in favor of Dr. El Chaar, his claims cannot survive summary judgment because he cannot raise a triable issue of fact as to whether: (1) NYU's legitimate nondiscriminatory reasons for failing to appoint him Chair were a pretext for retaliation; or (2) Plaintiff was subjected to harassing conduct that rises to the level of an unlawful hostile work environment. Therefore, the Judgment of the District Court must be affirmed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. The District Court had subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 with respect to Dr. El Chaar's causes of action under §1981. The District Court declined to assert supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to Dr. El Chaar's causes of action under the New York State Human Rights Law, New York Executive Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law ("NYCHRL").

## COUNTER-STATEMENT OF ISSUES

(1) Did the District Court correctly grant summary judgment dismissing Dr. El Chaar's §1981 retaliation claim where the record was void of sufficient evidence to establish that Dr. El Chaar's race or national origin or his prior complaint of harassment was a factor in the process to select a chair of the Department of Periodontology and Implant Dentistry?

(2) Did the District Court correctly grant summary judgment dismissing Dr. El Chaar's hostile work environment claims where the record was completely void of admissible evidence of harassment during the limitations period?

## COUNTER-STATEMENT OF FACTS[2]

## I.    THE PARTIES

### A. NYU College of Dentistry and the Department of Periodontology and Implant Dentistry.

Charles Bertolami joined NYU in 2007 as Dean of the College of Dentistry ("the Dental School"). (A. 46). Dean Bertolami relies on an informal group of senior administrators to advise him and to address various academic and administrative issues that arise at the Dental School (hereinafter referred to as the "executive

---

[2] The remaining issues before this Court concern Dr. El Chaar's allegations of retaliation and a hostile work environment, under §1981. For a full recitation of the facts, NYU refers the Court to the parties' Combined Statement of Uncontested Facts Pursuant to Rule 56.1 of the Local and Civil Rules of the U.S. District Courts for the Southern and Eastern Districts of New York filed in connection with Appellee's underlying Motion for Summary Judgment. (A. 46-96; S.A. 22-48). NYU also provides its summary of the relevant facts herein as it relates to the claims at issue and to clarify the representations included in Appellant's Brief.

committee"). (S.P.A. 2; A. 48). The executive committee does not keep minutes of its monthly meetings. (A. 48, 554).

The Dental School has 11 departments, each of which has its own department chair. (S.P.A. 2; A. 46). The Department of Periodontology and Implant Dentistry (the "Department") is the second-largest department within the Dental School, with two divisions and over 120 faculty. (S.P.A. 2; A. 52). Dr. Steven Engebretson served as Chair of the Department from 2012 until 2014 and stepped down to focus on research and his private practice. (A. 54, 59). On February 2, 2014, Dr. Peter Loomer, the Director of Periodontology, was appointed as his replacement. (A. 59).

**B. Dr. El Chaar.**

Dr. El Chaar began studying at the Dental School in 1993 and from 1995 to June 2012, Dr. El Chaar was employed as a part-time faculty member at the Dental School, during which time he taught one day a week at most. (S.P.A. 2; A. 46-47). Between 2012 and 2013, Dr. El Chaar left NYU to become the program director at Lutheran Medical Center but returned full-time to NYU in August 2013 as the Department's Program Director of Postdoctoral Periodontology after the death of the prior Program Director, Dr. Bob Shoor. (S.P.A. 2; A. 47, 55).

## II. APPELLANT'S HOSTILE WORK ENVIRONMENT CLAIM IS BASED ON SPORADIC COMMENTS AND A MYRIAD OF INTERPERSONAL CONFLICTS NOT BASED ON RACE OR NATIONAL ORIGIN.

Dr. El Chaar alleges that, during the period from 1995 to 2012 prior to his one-year break in service, faculty members made "sporadic" comments to El Chaar, who is Lebanese, about his ethnicity and race. (S.P.A. 2; A. 55). Between 1994 and 1997, Dr. Bruce Davidson, a part-time faculty member, allegedly called El Chaar a "camel-jockey" or referred to him as an Arab. (A. 55). Dr. El Chaar initially had a great relationship with Dr. Schoor and the faculty that supported Dr. Schoor. (A. 55, 238). Around 2001, after Dr. El Chaar's purchase of a private practice from Dr. Harold Sussman, a close friend of Dr. Schoor, Dr. El Chaar had a business dispute with Dr. Sussman, regarding which Dr. Schoor became upset and allegedly called Dr. El Chaar a "dirty Arab." (S.P.A. 2; A. 55-56). Dr. Schoor did not make any offensive remarks to Dr. El Chaar from that point forward. (A. 56). Between 2004 and 2012, Dr. El Chaar's interactions with the faculty that supported Dr. Schoor were very minimal. (A. 57). In August 2013, Dr. El Chaar was recruited and returned to the Dental School as Dr. Schoor's replacement as the Department's Program Director. (S.P.A. 2; A. 57).

Dr. El Chaar alleges that, in October 2013, shortly after he started his position, Dr. Davidson said he would bet 50 cents that Dr. El Chaar will not last a year as Program Director and asked him "What are you doing with all the Jews?" (A. 60-

61, 217). On October 11, 2013, Dr. El Chaar and Dr. Davidson exchanged emails about the comments and Dr. Davidson did not make any further comments to Dr. El Chaar about his race or national origin thereafter. (A. 60-61, 222-225).

Dr. El Chaar testified that as a Lebanese individual, he considers being called an Arab insulting and racial discrimination because,

> "[t]hat means you are accusing them to be an antisemite. It's a very well-known fact. Everybody knows that when you say 'Arab,' that is Muslim. And if it's a Muslim, that means it's an anti-Jew…When you call somebody an Arab, that means you are a dirty Arab, that's what it means. That means I am a Muslim, that I am a terrorist and a criminal. That's what it means. That's as simple as that…"
> (A. 94-95).

Between 2013 and 2017, Dr. El Chaar made various complaints regarding interpersonal conflicts and issues within the Department that were unrelated to his race or national origin. For example, Dr. El Chaar and Dr. Loomer disagreed on the respective roles and responsibilities of the Chair and Program Director. They disagreed as to how to run the Program, including regarding the hiring of faculty and the interpretation of the Commission on Dental Accreditation ("CODA") guidelines; these differences created conflict within the Department. (A. 62-63, 187, 213). In February 2015, Dr. El Chaar complained to Dr. Loomer about Dr. Mitchell Bloom undermining his authority as Program Director by having the residents upload their cases on a web space folder. (A. 63-64). In May 2015, Dr. Loomer detailed Dr. El Chaar's poor performance to HR, reporting Dr. El Chaar's authoritarian attitude and

complaints from residents and faculty regarding his unprofessional behavior. (A. 64).

Dr. El Chaar did not allege race or national origin discrimination motivated this conduct by his colleagues; he assumed various faculty members had a bias against him because of their prior relationship with the deceased Dr. Schoor, based solely on whether they were taught or hired by him. (A. 61).

Dr. El Chaar had the largest personal conflicts with Drs. Bloom and Roger Warren. (A. 69). Dr. El Chaar admits that part-time faculty were of "unequal, zero consequences to the program." (A. 69). For example, in April 2014, Dr. El Chaar met with Julia Murphy, the Assistant Dean of Human Resources and Faculty Services and the HR Officer of the Dental School, and complained that Dr. Warren "is a handful and I can't get him under control" and "[kept] changing and making it difficult for [him] to run the Program." (A. 51, 63). Dr. El Chaar also raised an issue with his schedule and a dispute with Dr. Loomer about the days he was required to work. Given that it was a departmental issue, Ms. Murphy reported his concerns to Dr. Loomer and Dean Louis Terracio, the Vice Dean for Academic Affairs and Research. (A. 48, 63).

Dr. El Chaar continued to have interpersonal conflicts with Dr. Warren that were unrelated to Dr. El Chaar's race or national origin. On April 1, 2016, Dr. El Chaar informed Dr. Warren that he was no longer allowed to return to the Perio-

clinic because he had commented to students that "Dr. Schoor would have been better at handling the symposium" than Dr. El Chaar was. (A. 65). In April 2016, Dr. El Chaar also complained to Dr. Loomer about Dr. Warren referring to him as Donald Trump because he "expressed an opinion." (A. 66, 1396, 1476, 2258).

In September 2016, Dr. El Chaar reported to Ms. Murphy that he wanted Drs. Warren and Bloom terminated because they undermined his authority. (A. 67, 1433). Dr. El Chaar also detailed his history of disputes with Dr. Schoor, who had been deceased for over three years at that point, and other members of the faculty. Dr. El Chaar could not specify or recall any recent dates where he heard a slur against him but complained to Ms. Murphy that he was informed that Dr. Warren referred to him as Hitler. (A. 67, 247-248, 1433). Ms. Murphy explained the definition of a hostile environment and Dr. El Chaar explained that it was not that type of situation and he did not want to file a complaint with NYU's Office of Equal Opportunity ("OEO"). (A. 67. 1433).

In May 2017, Dr. Bloom filed an allegation of academic misconduct against Dr. El Chaar. (A. 69). After investigation, it was determined that there was no evidence of misconduct. (A. 70). Dr. El Chaar alleges Dr. Bloom knowingly made a false allegation against Dr. El Chaar because Dr. Bloom sees him as an Arab, but Dr. El Chaar did not identify any specific statements or actions by Dr. Bloom to support this belief. (A. 69, 95, 264-267). Unhappy with the allegation against him,

Dr. El Chaar characterized Dr. Bloom's filing of the academic complaint as harassment and urged NYU to discipline Dr. Bloom for making the complaint by revoking his access to the Perio-clinic. (A. 70). In July 2017, Dr. El Chaar complained to Human Resources and stated that his harassment claims had not been addressed. (A. 71).

Human Resources referred the matter to OEO, and, in August 2017, Dr. El Chaar filed a complaint of discrimination and retaliation against Drs. Loomer[3], Warren and Bloom. (A. 71). As part of the investigation, Dr. El Chaar was interviewed and provided documentation, including a timeline of events since he became Program Director; the timeline did not allege any direct comments toward him but alleged there was an implication and inference of harassment. (A. 72). On or about February 7, 2018, relying on conduct that allegedly occurred between 2013 and 2017 and upon hearsay statements from witnesses indicating, among other things, that Dr. El Chaar was referred to as antisemitic, a foreigner, or an Arab by Dr. Warren and some unidentified faculty at unidentified times (the "Report Acts"), the OEO found that the evidence supported a general finding of a hostile work environment in the Department that violated NYU policy but that the individual respondents had not engaged in actionable misconduct. (S.P.A. 3; A. 72, 1457-

---

[3] Dr. El Chaar testified Dr. Loomer held no animus toward Dr. El Chaar based on his race or national origin. (A. 95).

1478).

The OEO issued the investigation report to Dean Bertolami and the Dean was responsible for deciding the appropriate response. (S.P.A. 3; A. 72). Dean Bertolami had a discussion with OEO Investigator Roberto Concepcion regarding recommendations for responsive action. (S.P.A. 3; A. 52, 73). The OEO recommended a training program for the Department faculty and for the Dental School's leadership. (S.P.A. 3; A. 73). The Dean required the Department faculty to attend a two-part training program. (A. 73).

Dr. El Chaar does not allege any of the Report Acts occurred after the filing of the OEO complaint. (S.P.A. 10). By 2018, Dr. El Chaar also asked Dr. Bloom not to return to the clinic. (A. 81). In fact, on June 27, 2020, Dr. El Chaar explained to Dean Bertolami that Dr. Warren "reached out multiple times to make peace" but he continues to have problems with Dr. Bloom (even though they had limited interaction) but no one else. (A. 2006). Dr. El Chaar clarified that "the main instigator was [Dr. Warren] and [Dr. Warren] has [come] to peace with it." (A. 2006).

Dr. El Chaar, however, continued to have interpersonal conflicts with other faculty that were unrelated to his race or national origin. In October 2018, at the Northeast Society of Periodontology (NESP) meeting, Dr. Horowitz, a part-time faculty member in the Perio-clinic, allegedly made negative comments about Dr. El

11

Chaar by stating the faculty destroyed the program. (A. 81). Dr. El Chaar speculated Dr. Horowitz made these comments because Dr. Horowitz believed Dr. El Chaar was an antisemite because he removed only Jewish faculty members from the clinic. (A. 82). Dr. El Chaar did not have any evidence to support this belief but also removed Dr. Horowitz from the perio-clinic. (A. 81). Dr. Tang was the incoming president of NESP when Dr. Horowitz made the comments. (A. 82). Dr. El Chaar requested Dr. Tang apologize for the comments made at the conference. (A. 82). Dr. Tang refused to apologize which resulted in conflict between Dr. El Chaar and Dr. Tang. (A. 82).

On July 20, 2019, Dr. El Chaar sent Drs. Schreiber and Asgeir Sigurdsson a letter detailing his conflicts with Drs. Horowitz and Tang that he qualified as an attack on his "character and profession" for the comments made at NESP. (A. 83). Dr. El Chaar requested that these two be removed from the Department. (A. 83). Dr. El Chaar also alleged Drs. Warren and Bloom accused him of being antisemitic without any further detail or evidence to corroborate his claims. (A. 83).

## III. **DR. EL CHAAR WAS NOT APPOINTED CHAIR BECAUSE HE WAS NOT THE BEST CANDIDATE.**

### A. **History and Process of Appointing Department Chairs.**

Being appointed chair of a department is not a promotion but an administrative appointment. (A. 49, 910). When a Chair position becomes vacant, the Dean, with the advice of the executive committee and the approval of the Provost, decides

12

whether to appoint an interim chair and when to begin a search for a permanent replacement. (A. 47, 74). Interim chairs are routinely appointed at the Dental School. (A. 75). Several factors are considered in determining the strategy for filling a vacancy, including whether the current chair is willing/able to stay until a replacement is found, the size of the department, the complexity of the department, and whether there are problems that need to be resolved to make the environment attractive for potential candidates. (A. 74-75).

Typically, the Dean selects an experienced administrator, who has no intention of applying for the permanent position to serve as interim chair. Part of the interim chair's role is to evaluate the department for the Dean, make improvements, resolve conflicts and rebuild. (A. 74-75). For example, Dr. Stuart Hirsch, a senior administrator and the Associate Dean for International Programs, served as Interim Chair of the Department from 2010 to 2012 to address various administration issues, a fiscal deficit, conflicts between the two divisions, and a number of patient complaints within the Department after Dr. Dennis Tarnow stepped down. (A. 53-54). In 2012, after evaluating the state of the Department, the Dean decided, in collaboration with the executive committee, to begin the search for a permanent chair. (A. 53-54, 469-470). The search committee identified three finalists and Dr. Loomer was the top contender until the final stages of the search process when the search committee learned that Dr. Engebretson, an external candidate, was interested

in the position. (A. 54, 59-60, 470-471). Dr. Engebretson was appointed Chair of the Department and Dr. Loomer was recruited as Director of Periodontology. (A. 54-55).

In 2022, Dr. Rick Valachovic, Director for the Center for Oral Health Policy and Management, was appointed as interim chair for the Department of Epidemiology & Health Promotion because there was significant dissension among the faculty. (A. 75). Similarly, Dr. Robert Glickman; Associate Dean of Communications, was appointed interim chair for the Dental School's largest department, Cariology and Comprehensive Care, because of the size of the department and a senior administrator was needed to evaluate the program and make improvements to attract a quality candidate. (A. 75-76). Senior Associate Dean for Academic Affairs, Dr. Andrea Schreiber, also served as an interim chair for Cariology and Comprehensive Care after a previous vacancy. (A. 48, 75-76). Similarly, over the course of his career, Dean Terracio served as interim chair of two departments twice and two departments once. (A. 53, 76).

Although Dean Bertolami is the ultimate decisionmaker for appointing chairs, he regularly solicited the faculty's feedback when selecting a permanent chair. (S.P.A. 2; A. 90). In prior searches, soliciting faculty input was commonly done for high-level positions, such as for the chair positions in Orthodontics and in Epidemiology and Health Promotion. (A. 90). Dean Bertolami conducted a 360

evaluation and a listening tour for faculty input for these positions. (A. 90). Surveys were also used in lower-level faculty searches. (A. 90, 1243).

**B. <u>Pursuant to NYU's Routine Operating Procedure, After Dr. Loomer Resigned, an Interim Chair Was Appointed.</u>**

In Fall 2018, Dr. Loomer announced he would be leaving NYU and formally resigned as Chair of the Department in 2019. (A. 76). Because Dr. Loomer was set to begin his new position in a short period of time, he could not remain at NYU until a suitable replacement was found. (S.P.A. 3; A. 76). At the time of Dr. Loomer's resignation, the Department was fractious, there were issues with (1) patient complaints, (2) concerns with the rigor of the requirements for the predoctoral program, and (3) differences among the faculty as to the vision for the Department, which created operational issues. (S.P.A. 3; A. 77). Consistent with the process described above for other Departments, Dean Bertolami sought a senior administrator from outside the Department to address whatever issues the Department was facing to make the Department more attractive to a potential applicant. (A. 78).

Shortly after Dr. Loomer announced his planned departure, Dr. El Chaar met with Dean Bertolami to express his interest in the chair position. (S.P.A. 4; A. 76). Dean Bertolami informed Dr. El Chaar that he was selecting Dr. Sigurdsson, Chair of Endodontics, as interim chair and that everyone would benefit from a cooling-off period. (S.P.A. 4; A. 50, 78, 282). Dean Bertolami informed Dr. Sigurdsson there

was some historical turmoil in the Department and he wanted him to observe and correct the functioning of the Department. (A. 78). Around December 2018, Dr. El Chaar made a retaliation complaint to OEO regarding the appointment of the interim chair, alleging the Dean appointed an interim instead of him because of his OEO complaint. (A. 79). OEO found there was no basis to investigate a retaliation complaint because Dr. El Chaar had not been denied an opportunity because the position had not been posted or filled. (A. 79, 1126).

## C. **Dr. El Chaar Was Not Appointed Chair Because He Was Not the Best Candidate.**

On May 28, 2020, Dean Bertolami planned to appoint Dr. El Chaar interim chair if there was a change in the Office of Academic Affairs that necessitated Dr. Sigurdsson's appointment as the interim Vice Dean of Academic Affairs and Research. Ultimately, there was no such need. (A. 84).

Dr. El Chaar mischaracterizes the June 27, 2020 zoom call he surreptitiously recorded with Dean Bertolami regarding his future at NYU. (The full transcript is available for the Court's review.) (A. 2000-2010). During this conversation, they discussed, among other things, the search process for a permanent chair. (A. 84, 2000-2010). Dean Bertolami acknowledged Dr. El Chaar's interest in the chair position and explained the search process and the need to have a chair with strong leadership skills. (A. 2003). Dean Bertolami also addressed his previous decision to select an interim chair, clarifying that "it was [his] opinion at the time that what

would benefit [Dr. El Chaar] would be a period of cooling off. Not [Dr. El Chaar] cooling off…other people cooling off." (A. 2003). Dean Bertolami stated, "Things have been quiet. So that's a good thing. And so my hope is that you have benefited from [Dr. Sigurdsson's appointment as interim chair] because I would appoint you tomorrow if I didn't think that there was a potential of creating a crisis." (A. 2004). Dean Bertolami explained that he could not appoint Dr. El Chaar without a search committee, but before he started that process, he inquired whether "enough time gone by for water to pass under the bridge that they would not go…out of their way to mobilize people against you." (A. 2005). Dean Bertolami explained to Dr. El Chaar that he would consider Dr. El Chaar's judgment as to whether it was the right time for Dr. Sigurdsson to step down and the search to commence. (A. 2005). In response, Dr. El Chaar explained that there were really only two people with whom he had issues, explaining that "the main instigator was [Dr. Warren]" and Dr. Warren "reached out multiple times to make peace." (A. 2006) Dr. El Chaar explained that the only faculty member with whom he continued to have problems was Dr. Bloom, noting, "It doesn't matter who is going to come [in as chair], he is always going to find a negative part…that's his nature." (A. 2006-7). Dean Bertolami believed that once the search opened, Dr. El Chaar would be a strong candidate and would likely be the final choice for chair. (A. 85).

Subsequent to the June 27th Zoom meeting, Dean Bertolami met with the

executive committee and the search committee for the Department chair was subsequently formed. (A. 85). Dean Bertolami and Dr. Schreiber, the head of the search committee, both ensured that the individuals who were selected for the search committee did not have any history of conflict with Dr. El Chaar, and Dr. El Chaar agrees that none of them had a bias against him. (S.P.A. 6; A. 85-87, 2005). The search committee recommended four finalists (three of whom were external candidates) to Dean Bertolami for further consideration, including Dr. Palomo and Dr. El Chaar. (A. 87). Dean Bertolami wanted to have all of the finalists present some aspect of their work — a common academic practice. (A. 87-88).

Once the finalists were selected, they were invited for interviews with each member of the executive committee. (A. 87-88). During Dr. El Chaar's finalist interview on April 21, 2021, Dr. El Chaar told Dean Bertolami that he would resign if he did not receive the promotion. (A. 92-93). After the interviews, Dean Bertolami sent a survey to the Department faculty to get a sense of their view of the finalists, based on the presentations. (A. 88). Dean Bertolami testified that the survey was created in response to Dr. El Chaar's interview statement that he would fire four or five colleagues if he were to become the permanent chair. (A. 565, 572). The feedback from faculty was solicited in a written survey because the pandemic made it difficult for the faculty to gather in person and, due to the size of the Department, video conference was impractical. (A. 88). The anonymous survey was sent to 77

full-time and adjunct Department faculty and was completed by 40/41 faculty members. (A. 89). Although Dr. El Chaar received the most first place rankings in the survey, he also received the most last place rankings. (A. 89-90). Similarly, the narrative comments reflected that some faculty thought very highly of Dr. El Chaar while others complained that he was "vindictive," "divisive," "narcissistic," holds grudges, provokes anxiety, and "bullies" faculty and residents. (A. 89-90).

Dean Bertolami was seeking a department chair candidate with an outstanding academic record; a good teacher, clinically and academically; someone with credibility; a consensus builder; and someone very good at interpersonal relationships with a preference for a tenured full professor. (A. 87). Similar to the prior 2012 search process for the Department chair in which Dr. Loomer was initially the front runner but Dr. Engebretson was eventually selected, Dr. El Chaar was the leading candidate until Dr. Palomo applied and was deemed the most qualified candidate. (A. 59-60, 90-91, 470-471). Dr. Palomo was selected chair with strong support from the executive committee because she was a full tenured professor, a diplomate of the periodontal association, a member of the board of examiners, and chair elect of the university senate at Case Western Reserve, all of which also suggested strong interpersonal skills, academic record, reputation and leadership. (A. 91). Dr. El Chaar conceded[4] he was a good second choice but was not the finalist

---

[4] Dr. El Chaar failed to respond to paragraph 183 of the 56.1 that stated this fact, which is deemed

because (1) he was not on a tenure track, (2) he was rejected for promotion and for membership in the Academy of Distinguished Educators and (3) he was emotional and divisive, using terms like "friends" and "enemies" to describe faculty in the Department. (A. 91). If Dr. Palomo rejected the offer, Dr. El Chaar would have been offered the position of chair. (A. 91-92).

On May 13, 2021, Dean Bertolami personally called Dr. El Chaar to tell him that he had not been selected for chair and asked him to stay on as Program Director. (A. 92-93). Immediately after Dean Bertolami informed Dr. El Chaar that he had not been selected as Chair, Dr. El Chaar called Dr. Sigurdsson to resign from his position as Program Director effective immediately. (A. 94).

## <u>SUMMARY OF ARGUMENT</u>

Dr. El Chaar's mere dissatisfaction with the outcome of the underlying action is insufficient to warrant the reversal of the District Court's well-reasoned decision. The District Court used sound reasoning and carefully analyzed the evidence, finding that: (1) a large portion of Dr. El Chaar's allegations are time-barred or premised on inadmissible evidence or hearsay; and (2) Dr. El Chaar cannot establish pretext in support of his retaliation claims.

---

admitted. *See* A. 91; Fed. R. Civ. P. 56(e)(2)-(3). Dr. El Chaar cannot dispute this fact on appeal. *See Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global LLC*, No. 21-2059-cv, 2022 U.S. App. LEXIS 18651, at *4, n 3 (2d Cir July 7, 2022) (Court rejected plaintiffs' counsel's attempt to assert new facts on appeal in contrast to admissions in 56.1).

Dr. El Chaar relies on allegations for which there is no admissible evidentiary support and facts that are taken out of context in his attempt to weave a misleading narrative to suggest that NYU leadership ignored his allegations of harassment and sought to punish him for making a complaint. On the contrary, the evidence establishes that NYU took Dr. El Chaar's allegations of misconduct seriously, conducted a thorough investigation, and took appropriate steps to prevent the behavior from recurring by conducting two live trainings for both the faculty in the Department and Dental School leadership.

In 2018, when the Department chair resigned, the Dean appointed an interim chair from another department, as he had in many other circumstances, because he felt that it would not be fair or beneficial to appoint someone as interim who sought the permanent position or to conduct a search because there had been turmoil in the Department, a lot of which had nothing to do with Dr. El Chaar or his complaint. When Dr. El Chaar informed the Dean that relations among the faculty had improved and Dr. Sigurdsson confirmed that the overall state of the Department had improved, a search for a permanent chair was conducted in the ordinary course and Dr. El Chaar was the second choice among 17 applicants for the position. The undisputed evidence does not permit a jury to find that a retaliatory animus motivated the decisions regarding the selection of a more qualified candidate for interim and permanent chair.

Simply having a subjective feeling of discriminatory treatment is insufficient to state a plausible claim for relief. Dr. El Chaar claims that he was subject to a hostile work environment because of his race or national origin are belied by the fact that NYU endeavored, on countless occasions, to foster success for him as Program Director, yet he continued to have interpersonal disputes with various faculty and blamed any negative interaction as stemming from a misguided and xenophobic theory that being called Arab is derogatory and offensive. Instead, Dr. El Chaar admitted that his relationship with the prior Program Director and his allies was positive until he had a falling out with the prior Program Director over a business dispute. Dr. El Chaar's subsequent conflict with his colleagues was motivated by factors having nothing to do with his race or national origin. Regardless, there is no admissible evidence of harassing conduct during the limitations period; indeed, Dr. El Chaar admitted to the Dean in 2020 that his relationships with the faculty were positive and that the "main instigator" of the alleged harassment had come to him to "make peace." (A. 2006). As such, these interpersonal disputes are not, as Dr. El Chaar suggests, evidence discounted by the District Court or questions of fact for a jury to decide.

Dr. El Chaar's appellate brief asks this Court to reach his preferred conclusion using the same bare assertions that he made to the District Court, while simply ignoring the hearsay and admissibility issues of his alleged evidence. Dr. El Chaar

has not and cannot identify any genuine issues of fact to be decided by a jury; therefore, this Court should affirm the District Court's opinion dismissing Dr. El Chaar's claims for failure to establish a prima facie case of retaliation or hostile work environment.

## STATEMENT OF STANDARD OF REVIEW AND SUMMARY JUDGMENT STANDARD[5]

In reviewing a district court's decision granting a motion for summary judgment, the Court of Appeals reviews the record *de novo*, construing the facts in the light most favorable to the non-moving party and resolving all ambiguities and drawing all reasonable inferences against the movant. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). "While it is true that a court is required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant, a plaintiff may not survive summary judgment merely by conjuring a hypothetical issue of material fact." *Robinson v. Concentra Health Services, Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citations and quotations omitted). The party opposing summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id. (citing Brown v. Eli Lilly & Co.*, 654 F.3d

---

[5] Dr. El Chaar failed to set forth any meaningful arguments regarding the District Court's grant of summary judgment on the following claims: (1) discrimination under § 1981; and (2) constructive discharge. Because Dr. El Chaar essentially abandoned these claims, they should be deemed waived. *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 n.1 (2d Cir. 2013) ("Appellants do not preserve questions for appellate review by merely incorporating an argument made to the district court by reference in their brief.") (internal citations and quotations omitted).

347, 358 (2d Cir. 2011)). "Although the evidence is viewed in favor of the non-moving party, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Lunts v. Rochester City Sch. District*, 515 Fed. Appx. 11 (2d Cir. 2013) (summary order) (internal quotations and citations omitted).

"The non-moving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998). Moreover, the "summary judgment rule would be rendered sterile...if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Thus, a plaintiff must "offer concrete evidence from which a reasonable juror could render a verdict in [her] favor, and is not entitled to a trial simply because the determinative issue focuses upon the Defendant's state of mind." *Dister v. Grp. Continental, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (internal citations and quotations omitted). A de novo review of the record makes it clear that there are no material issue of fact. Contrary to Dr. El Chaar's contentions, there is nothing in the Order that suggests Judge Torres made inappropriate credibility determinations or disregarded evidence in granting summary judgment.

## ARGUMENT

I. **DR. EL CHAAR CANNOT CREATE A FACTUAL DISPUTE WHERE THERE IS NO ADMISSIBLE EVIDENCE TO SUPPORT HIS CLAIMS.**

Dr. El Chaar primarily argues that the "the District Court erred in ignoring and/or discounting [] evidence" he submitted in his 56.1 Statement of Additional Facts (Pl. 56.1), which included 101 additional paragraphs setting forth lengthy, argumentative and conclusory allegations, relying on evidence that is either inadmissible or does not support his contentions. NYU's responses highlighted these deficiencies and presented admissible evidence to establish the material facts. (S.A. 22-48). Where Dr. El Chaar's 56.1 relied on "no citations[,] or where the cited materials [did] not support the factual assertions in the [s]tatements," Judge Torres appropriately exercised her discretion to disregard the assertion. (S.A 1).

Dr. El Chaar baselessly argues that the District Court overlooked admissible evidence. On the contrary, the District Court detailed the same facts to which Dr. El Chaar refers and properly determined that the evidence was hearsay or otherwise inadmissible. Judge Torres noted Dr. El Chaar "[did] not respond to Defendant's hearsay objection in his opposition papers or indicate that the cited materials could "be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2); *Malik v. City of New York,* 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may…infer from a party's partial opposition that relevant claims or defenses

25

that are not defended have been abandoned" (cleaned up))." (S.P.A.12).

## A. **The District Court Did Not Make Impermissible Credibility Assessments.**

Dr. El Chaar cannot avoid summary judgment by relying on his own subjective beliefs and purported "facts" that have no admissible evidentiary support. Dr. El Chaar's claim that the District Court's factual findings based on the undisputed evidence were impermissible credibility determinations that should have been left to the jury has no basis in fact or law. (App. Br. 18-19). With respect to his retaliation claims, Dr. El Chaar fails to comprehend that he was not the most qualified candidate for the interim and permanent chair position and ignores his own admissions in the 56.1 regarding why he was a second-place candidate for the Chair position. (A. 91-92). As for the hostile work environment claims, Dr. El Chaar relies upon allegations for which there is no admissible evidentiary support and facts that are taken out of context in his attempt to weave a misleading narrative to suggest that the Dental School's leadership ignored his allegations of harassment and failed to investigate his complaints which were tantamount to a policy of permitting discrimination. Dr. El Chaar failed to meet his burden, relying on purported facts based on mischaracterizations of the evidence, and failed to acknowledge any arguments relating to hearsay and admissibility.

Even drawing all inferences in Dr. El Chaar's favor, his subjective beliefs and/or "factual" allegations in his 56.1 Statement of Additional Facts, which lack

support in the record or are based on inadmissible evidence, which were expressly rejected by Judge Torres as improper and legally defective, are insufficient to raise a genuine dispute of material fact. This conclusion is reinforced by the 172 undisputed paragraphs of the 204[6] paragraphs in NYU's 56.1 Statement ("56.1"). (A. 46-98). A party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact to be decided by a jury. *Rojas v. R.C. Diocese of Rochester*, 660 F3d 98, 105 (2d Cir. 2011) (District Court did not make improper credibility determination where Court scrupulously detailed plain inconsistencies between the facts and plaintiff's opposition relied almost entirely on her own testimony and defendant submitted competent and persuasive evidence). Dr. El Chaar was given ample opportunity to address the hearsay or admissibility of the facts he relies on but failed to do so in his underlying opposition papers or in his appeal.

Nothing in the Order suggests any credibility assessments were made, or even necessary, based on the record evidence. Therefore, as discussed in greater detail below, the District Court correctly found that no material issue of fact existed and granted summary judgment on behalf of NYU.

---

[6] Of the remaining 31 paragraphs, many paragraphs include partial admissions or dispute facts that are not material. *See* (A. 46-98).

## II.     DR. EL CHAAR FAILED TO ESTABLISH RETALIATION AS A MATTER OF LAW.

To establish a prima facie case of retaliation under § 1981, Dr. El Chaar must show: (1) he engaged in protected activity; (2) NYU was aware of the activity; (3) he suffered from an adverse action; and (4) a causal connection existed between the protected activity and the alleged retaliatory action. *Gachette v. Metro N.-High Bridge*, 722 F App'x 17, 20 (2d Cir. 2018). Given Dr. El Chaar's reliance on indirect evidence of retaliation to establish his claims, his claims are subject to the same burden-shifting rubric established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Once NYU proffers a legitimate, nonretaliatory reason, to withstand summary judgment under §1981, Appellant must establish that the allegedly deterring action would not have occurred "but for" the alleged protected activity. *Knight v. Nassau Cnty.*, 852 F App'x 42, 44 (2d Cir. 2021). To show that the reason for his employer's refusal to promote him was pretextual, Appellant must show by a preponderance of the evidence that NYU's justifications "were not its true reasons, but were a pretext for [retaliation]." *Richardson v. Comm'n on Hum. Rts. & Opportunities,* 532 F.3d 114, 125 n.11 (2d Cir. 2008) (citation omitted). Although Dr. El Chaar's brief contains a litany of allegations, none of them have merit even when viewed in the light most favorable to Dr. El Chaar. For the reasons set forth below, Dr. El Chaar's retaliation claim must be dismissed as a matter of law.

**A. The District Court Correctly Determined that NYU Did Not Retaliate against Dr. El Chaar in Not Appointing Him as Interim Chair.**

Dr. El Chaar cannot establish a retaliatory motive or pretext because he cannot identify any evidence beyond one offhand comment; and he cannot establish that (1) NYU's reason was for selecting Dr. Sigurdsson was false; (2) his credentials were superior to Dr. Sigurdsson; or (3) he would have been appointed interim chair but for his OEO complaint. Instead, Dr. El Chaar makes the same conclusory allegations in his brief as he did in his opposition to summary judgment to allege that he was retaliated against when he was not appointed the interim chair of the Department because of his OEO complaint.

It is undisputed that the Department was fractious and there were multiple sources of turmoil at the time of Dr. Loomer's resignation, including clinical and philosophical differences between the faculty on the implant side and those in periodontics, various patient complaints, and other operational issues that had nothing to do with Dr. El Chaar. (A. 78). A senior administrator is routinely appointed as interim when such conflicts exist within a department, as was done previously with the Department as well as in the Departments of Epidemiology & Health Promotion, Cariology and Comprehensive Care and others. (A. 75). An interim chair's role is to "evaluate the department for the Dean, make improvements, resolve conflicts and rebuild." (A. 74-75). Similar issues facing the Department existed in 2010 when Dr. Hirsch, a senior administrator who was not part of the

Department, was appointed as interim chair and a search for a permanent chair began only when the situation in the Department was deemed under control. (A. 53-54, 469-470). Given the problems afflicting the Department in 2018, NYU acted consistently with its past practice and in the best interest of the Department when it opted to appoint external senior administrator Dr. Sigurdsson to serve as Interim Chair to observe and correct the functioning of the Department. (S.P.A. 15; A. 78). *Weinstock v. Columbia Univ.,* 224 F.3d 33, 45 (2d Cir. 2000) (holding that "consistency" supports the "proffered nondiscriminatory reason").

Regardless of Dr. El Chaar's complaint, he was not a suitable candidate for the interim position. Dr. El Chaar was not an experienced senior administrator and was not similarly situated to Dr. Sigurdsson - he had never been a department chair, was a member of the Department, and wanted the permanent position. Dr. El Chaar cannot establish that his credentials were so superior to Dr. Sigurdsson that he should have been chosen as interim. *See Jimenez v. City of N.Y.*, 605 F Supp 2d 485, 522 (S.D.N.Y. 2009) (legitimate reason found where the person who made the actual hiring decision testified that the applicant who was chosen had credentials superior to plaintiff's and explained why).

In selecting an interim chair from outside the Department, the Dean did not treat Dr. El Chaar less favorably than other similarly situated faculty in the Department. There were faculty in the Department who were not of Lebanese

national origin and did not make complaints who were interested in the Chair position who also did not get an opportunity to apply for the Chair position at the time of Dr. Loomer's resignation and were also not appointed Interim Chair. (A.87) (three internal candidates applied when the vacancy opened).

Dr. El Chaar cannot offer any evidence to support a finding that he would have been appointed interim had he not filed a complaint. There is no evidence to suggest Dean Bertolami and the executive committees' appointment of Dr. Sigurdsson over Dr. El Chaar was motivated by Dr. El Chaar's complaint. Even if Dr. El Chaar did not make the OEO complaint, the issues facing the Department would have still resulted in an external senior administrator being appointed interim chair. Dean Bertolami's comment that "[o]ther people," not just Dr. El Chaar, needed a cooling-off period is nowhere near a clear confession that Dr. El Chaar paints it to be, especially when in the same conversation, Dean Bertolami also stated "and so my hope is that you have benefited from [Dr. Sigurdsson's appointment as interim chair]." (A. 2004). *See Karimian v Time Equities, Inc.*, 569 F App'x 54, 54 (2d Cir. 2014) (summary judgment may be granted "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no [retaliation] had occurred.") (internal citations omitted). In fact, as the District Court

noted, in the June 2020 recording, Dean Bertolami explicitly stated he appointed an interim in part to help El Chaar's chances of becoming the permanent chair and although Dean Bertolami referenced the OEO complaint indirectly by discussing the state of the Department and the ability to follow Dr. El Chaar as a leader, he did not suggest that Dr. El Chaar did anything wrong by filing a complaint. Accordingly, Dr. El Chaar cannot establish that "but for" his complaint to OEO, he would have been appointed Interim Chair.

**B.**    **The District Court Correctly Determined that NYU Did Not Retaliate against Dr. El Chaar in Not Appointing Him as Permanent Chair.**

Dr. El Chaar provided no basis from which a reasonable factfinder could infer that the decision not to appoint Dr. El Chaar in May 2021 was remotely related to or in retaliation for his August 2017 OEO complaint. (App. Br. 28-29). The passage of approximately four years between Dr. El Chaar's August 2017 OEO complaint and the selection of Dr. Palomo as chair of the Department over Dr. El Chaar in May 2021 fails to establish the requisite causal connection for his retaliation claim. *See Woodworth v. Shinseki*, 447 Fed. Appx. 255, 258 (2d Cir. 2011) (summary order) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all.")).

Dr. El Chaar repeatedly mischaracterizes the surreptitious recording of his conversation with the Dean in June 2020. Dean Bertolami's indirect reference to the OEO complaint does not suggest that Dr. El Chaar did anything wrong by filing it

or that it influenced Dean Bertolami's decision to select Dr. Palomo as chair of the Department. Dr. El Chaar ignores the undisputed fact that the Dean intentionally took steps to give Dr. El Chaar the best possible chance of being selected as chair by ensuring the search committee did not include anyone who was antagonistic to Dr. El Chaar and considered Dr. El Chaar's judgment in determining whether it was the right time for Dr. Sigurdsson to step down and the search to commence. (A. 2005). Dean Bertolami believed that once the search opened, Dr. El Chaar would be a strong candidate and would likely be the final choice for chair. (A. 85). Similar to the 2012 search process for chair involving Dr. Loomer and Dr. Engebretson, Dr. El Chaar was the leading candidate until a more qualified candidate they did not anticipate applied.

Dr. El Chaar theorizes Dean Bertolami held retaliatory animus against him for his prior complaints without any factual support. Dr. El Chaar did not raise this argument to the District Court and previously alleged a cat's paw theory of liability. After the District Court found no evidence to sustain liability under such theory, Dr. El Chaar for the first time on appeal argues that Dean Bertolami held animus against Dr. El Chaar based on his prior OEO complaint. (App. Br. 30). At no time prior to his appeal has Dr. El Chaar ever alleged that Dean Bertolami said or did anything to suggest that he held any animus against Dr. El Chaar. In fact, the undisputed evidence establishes Dean Bertolami had a good relationship with Dr. El Chaar. (A.

277, 552). The Second Circuit has repeatedly held that issues not sufficiently argued are deemed waived and will not be considered on appeal. *Windward Bora LLC v. Sotomayor*, 113 F.4th 236 (2d Cir. 2024) (appellate court will not consider new arguments where arguments were available to the parties below and appellant proffers no reason for his failure to raise the arguments below) (internal citations omitted); *Free Holdings, Inc. v. McCoy*, No. 23-644, 2024 U.S. App. LEXIS 1045, at *3-4 (2d Cir. Jan. 17, 2024) (rejecting theories advanced for the first time on appeal). Therefore, the Court should not consider this argument raised for the first time on appeal.

Even if the Court were to consider this new theory, Dr. El Chaar mischaracterizes the evidence to allege there were procedural abnormalities in the hiring process that suggest pretext. Dr. El Chaar cannot establish how the Dean's decision to survey the faculty during the selection of the chair process was in any way based on a retaliatory motive. Dr. El Chaar alleges the survey was a "political race" and deviated from the process outlined in the Zoom call and from NYU's usual practice. (App. Br. 30-31). The general process outlined by the Dean during the Zoom call and his lack of reference to a survey is not evidence of any deviation from the Dental School's usual practice. First, it is undisputed that feedback, written or otherwise, had been solicited from departmental faculty in connection with numerous prior chair searches. (A. 90). A written survey was used here because a

live discussion was impractical due to the Department size and pandemic-related limitations. (A. 88). Second, the results of the survey were consistent with the Dean's motivation for a search for a suitable candidate. As noted by Judge Torres, Dr. El Chaar does not dispute that the Dean sought "a consensus builder; and someone very good at interpersonal relationships." (S.P.A. 20-21; A. 87). Dean Bertolami explained to Dr. El Chaar during their discussion in June 2020, "leadership is important" in selecting a chair (A. 2003) and a survey of the Department would help Bertolami assess those qualities, similar to the listening tours that Bertolami had conducted for other chairs. (S.P.A. 21-22; A. 90).

Dr. El Chaar cannot establish retaliatory animus based on the fact that the Dean did not detail how he would determine leadership qualities before the search for the position began or his alleged statement that he could not give Dr. El Chaar the position "based on the survey."[7] The survey was an explicit part of Dean Bertolami's rationale: he testified that Dr. El Chaar "was our second choice" prior to the survey, and that if, in the survey, "the faculty had strongly favored [El Chaar], we certainly would have reconsidered" the decision to choose Palomo. (A. 91, 565). The feedback indicated that it would be extremely difficult for Dr. El Chaar to

---

[7] 18 of the 40 faculty members who responded ranked Dr. El Chaar in last place and the narrative comments reflected that some faculty admired Dr. El Chaar while others complained that he was "vindictive," "divisive," "narcissistic," holds grudges, provokes anxiety, and "bullies" faculty and residents. (A. 89-90).

accomplish the goal of unification and strong leadership and could, potentially, put the Department at risk of losing faculty during a hiring freeze. (A. 565, 572). In addition to the fact that the Dean routinely solicited faculty feedback in searches, there was another legitimate, nonretaliatory basis for doing so here. Dr. El Chaar's claim is further undermined by the Dean deciding to use a survey after Dr. El Chaar's interview with the executive committee when he stated he would fire four or five colleagues if he were to become the permanent chair, which raised doubts about Dr. El Chaar's "capacity for leadership" and the veracity of his claim that his relationship with the faculty was "positive," as he had stated in the Zoom meeting. (S.P.A. 20; A. 565, 572). *See Tucker v. New York City*, 376 F App'x 100, 102 (2d Cir. 2010) (nothing unlawful about employer's basing its hiring decision on subjective criteria, such as impression an individual makes during an interview); *Fleming v. MaxMara USA, Inc.*, 371 F App'x 115, 117 (2d Cir. 2010)(assessing whether a person has "the judgment needed for the role" is a legitimate, nondiscriminatory motive…). As detailed by Judge Torres, Dr. El Chaar "has neither shown that the survey responses were infected with racial discrimination nor that Dean Bertolami acted negligently in considering them. Dean Bertolami's consideration of the survey does not render his reasons for choosing Dr. Palomo a pretext." (S.P.A. 20-21, 23; A. 88, 572).

Although there is no dispute that Dr. El Chaar met the minimum qualifications for the position, the salient question was whether Dr. El Chaar was the best candidate

for the position. Although Dr. El Chaar was a finalist and the Dean's second choice among 17 applicants for the position, he was not ultimately selected for the position because he was not the most qualified candidate. (A. 78, 80, 87, 91-92). Dr. El Chaar failed to proffer evidence, other than his own opinion, that NYU's legitimate nondiscriminatory reasons for not appointing him to chair of the Department were "so implausible as to call into question its genuineness." *Fleming*, 371 Fed. Appx.at 118. Dr. El Chaar makes no attempt to distinguish himself from Dr. Palomo and has adduced no evidence from which a reasonable jury could conclude that he was a stronger candidate than she was. Dr. El Chaar's subjective belief and conclusory assertion that he was a better candidate is insufficient to establish pretext, notwithstanding his concession that he was not the finalist because he (1) was not on a tenure[8] track, (2) was rejected for promotion in rank and for membership in the Academy of Distinguished Educators and (3) could be divisive and polarizing, using terms like "friends" and "enemies" to describe faculty in the Department and as evidenced by the feedback from the faculty in the survey. (A. 91). The evidence

---

[8] There is no dispute that tenure was not a requirement for the position, but, contrary to Dr. El Chaar's contention (without evidence), this does not mean that having tenure did not weigh in an applicant's favor. As Dean Bertolami testified, there is a "strong preference for a tenured full professor, although we don't always achieve that." (A. 89, 546). Tenure is relevant to whether the candidate had an "outstanding academic record," (A. 546-547), and Dean Bertolami's consideration of Dr. Palomo's tenure does not undermine the proffered rationale. *See Fleming,* 371 F. App'x at 118 ("Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

establishes that the hiring decision was made based on objective criteria and legitimate, nondiscriminatory and nonretaliatory factors, including the education, skills and experience of the applicants, their emotional intelligence, their history of service to the profession, leadership skills, research, academic record and personality. He cannot now allege or expect a jury to find that but for his 2017 complaint, he would have been appointed as chair.

In a misguided attempt to buttress his argument that NYU's legitimate reasons for its hiring decisions are a pretext for retaliation, Dr. El Chaar continuously and erroneously argues that there is evidence that NYU's explanation is false because the "Executive Group did not recall meeting about the decision to choose Dr. Palomo; meeting minutes[9] do not reflect such a meeting; emails show that at least one member who actually did rank the candidates believed Dr. El Chaar was the top candidate with Dr. Palomo third or fourth; and members of the Executive Group did not know that Dean Bertolami had selected Dr. Palomo until he sent an email announcing it." (App. Br. 31-32). These "facts" are a distraction and are irrelevant to the claims at hand. None of these allegations are purported evidence of pretext for

---

[9] Dr. El Chaar misleads the Court by arguing that a conclusion of pretext could be drawn from the lack of discussion about selecting Dr. Palomo in the meeting minutes for the EMC. The EMC is the central policy-making body in the Dental School and consists of the deans, vice-deans, associate deans, department chairs and the heads of the alumni association, fundraising and honorary societies. (A.74). Dean Bertolami did not discuss the selection of the chair with the EMC but with the informal executive group, which does not take minutes. (A.48, 74). Therefore, the EMC's minutes do not reflect any discussion of the Department Chair search and are irrelevant to the Court's analysis.

retaliatory animus because (1) Dr. El Chaar does not dispute that Bertolami's executive committee ranked Palomo first and El Chaar second; and (2) Dean Bertolami was the ultimate decision maker for the Chair appointment. (A. 90-92).

It is further undisputed that if Dr. Palomo rejected the offer, Dr. El Chaar would have been offered the position of chair. (A. 91-92). Accordingly, a reasonable factfinder cannot infer retaliatory motive in choosing Dr. Palomo over Dr. El Chaar. Moreover, even if Dr. El Chaar's conclusory allegations were sufficient to establish a prima facie case of retaliation, the District Court was correct in ruling that Dr. El Chaar failed to meet his ultimate burden of showing the existence of a triable issue of fact as to whether NYU's legitimate nonretaliatory reasons for selecting a different candidate are pretextual **and** that "but for" Dr. El Chaar's OEO complaint, the outcome would have been different.

### III. DR. EL CHAAR FAILED TO ESTABLISH A HOSTILE WORK ENVIRONMENT CLAIM AS A MATTER OF LAW.

To establish a claim of a hostile work environment under §1981, Dr. El Chaar must show discriminatory conduct that was sufficiently severe or pervasive to alter the conditions of his employment and that such conduct created an abusive working environment that occurred *because of* his race and/or national origin. *Ruiz v. SEIU Loc. 32BJ*, No. 19 Civ. 8810 (PAE) (KHP), 2023 U.S. Dist. LEXIS 132992, at *49 (S.D.N.Y. Apr. 17, 2023). Isolated and ordinary incidents, which do not implicate race are, at best, trivial, and not sufficiently severe or pervasive to establish a hostile

work environment claim. *Alvarado v. Nordstrom, Inc.*, 685 F. App'x. 4, 6 (2d Cir. 2017).

The statute of limitations under §1981 is four years; accordingly, any conduct that occurred before October 6, 2017 is time-barred. (S.P.A. 10); *Banks v. GM, LLC*, 81 F.4th 242, 260. Dr. El Chaar failed to identify any timely admissible evidence of harassing conduct to warrant the finding of policy or practice of harassment. This precludes invocation of the continuing violation doctrine because the timely incidents are not sufficiently related to the untimely incidents to constitute part of the same continuing hostile work environment— they all involved different perpetrators and qualitatively different incidents, spread out over a number of years. *See generally, Bright v. Coca-Cola Refreshments USA, Inc.*, 2014 U.S. Dist. LEXIS 155565, at *21 (E.D.N.Y. Nov. 3, 2014).

## A. The Alleged Conduct and Comments Do Not Support a Finding of a Policy or Practice of Discrimination.

In support of his hostile work environment harassment claim, Dr. El Chaar identifies the following allegedly harassing incidents during the limitations period: (1) the OEO issued its report finding evidence of a hostile work environment; (2) NYU's response to the OEO report; (3) the OEO's alleged failure to investigate his 2018 complaint; and (4) the July 2019 letter to Drs. Schreiber and Sigurdsson.[10] Dr.

---

[10] In the underlying papers submitted to the District Court, Dr. El Chaar identifies the following allegedly harassing incidents during the limitations period: (1) being accused of antisemitism; (2)

El Chaar cannot identify any conduct that is frequent or severe to establish a hostile work environment claim. *Alvarado*, 685 F. App'x. at 6.

Continuing violation requires proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice. *Batista v. Waldorf Astoria*, 2015 U.S. Dist. LEXIS 94023, at *13 (S.D.N.Y. July 20, 2015). The conduct that allegedly occurred within the statute of limitations that Dr. El Chaar relies on to argue that alleged conduct outside the limitations period should be considered is (1) based on inadmissible evidence; and/or (2) not related to any racial animus.

Although the OEO report was issued on February 7, 2018, none of the conduct investigated is alleged to have occurring during the limitations period. Dr. El Chaar's argument that there is a continuing violation is solely premised on the date the report[11] was issued, but he does not even attempt to argue how this has any

---

the Dean's use of a survey to elicit information from the department faculty about the four candidates for the chair position; and (3) the July 2019 letters. (S.P.A. 12). Accordingly, Dr. El Chaar should not be permitted to advance new theories for his hostile work environment claim on appeal because arguments raised for the first time on appeal are deemed waived. *Millea v. Metro-North R.R.*, 658 F.3d 154, 163 (2d Cir 2011) (*citing Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006) ("[T]his court ordinarily will not hear arguments not made to the district court.").

[11] The OEO's investigation is not bound by the law's limitations, such as the statutes of limitations and the rules of evidence. Further, statements within the OEO investigation report are inadmissible hearsay and can be relied upon only to establish what information was presented to OEO. Regardless, the fact that OEO found a policy violation does not mean that the law was violated. *See, e.g., Accely v. Consol. Edison Co. of NY*, 2023 U.S. Dist. LEXIS 69699, at *8, n 3 (S.D.N.Y. Apr. 20, 2023) (violation of EEO policy does not necessarily constitute a violation of federal, state

bearing on finding a continuing violation. Notably, throughout the investigation for Dr. El Chaar's August 2017 OEO complaint of discrimination and retaliation against Drs. Loomer, Warren and Bloom, he did not allege any direct comments toward him during the limitations period. Instead, his complaint was premised on allegations that there was an implication and inference of harassment relying on conduct that allegedly occurred between 2013 and 2017 and upon hearsay statements from witnesses indicating, among other things, that Plaintiff was referred to as antisemitic, a foreigner, or an Arab by Dr. Warren and some unidentified faculty at unidentified times. (A. 72, 196, 207, 229-230, 240, 294-295). The following admissions by Dr. El Chaar undermine any connection between the Report Acts and a finding of a continuing policy violation: (1) Dr. Loomer held no animus toward Dr. El Chaar based on his race or national origin; (2) there is no admissible evidence that any of the Report Acts occurred after the filing of the OEO complaint; (3) by 2018, Dr. El Chaar asked Drs. Bloom and Warren not to return to the clinic; (4) in June 2020, Dr. El Chaar explained to Dean Bertolami that Dr. Warren, whom he identified as "the main instigator", "reached out multiple times to make peace." (S.P.A. 10-11; A. 81-82, 95, 2006).

In an effort to overcome his hurdle in establishing a continuing violation Dr.

---

or city law); *Fattoruso v. Hilton Grand Vacations Co. 873* F. Supp. 2d 569, 581 (S.D.N.Y. 2012) (violation of internal policies does not necessarily amount to a violation of law).

El Chaar mischaracterizes his OEO complaint, disingenuously suggesting it included complaints against the entire Department, and generically alleges there was ongoing harassment subsequent to the OEO investigation. (App. Br. 36). *See Rivera v. JP Morgan Chase*, 815 F. App'x 603, 607 (2d Cir. 2020) (general allegations insufficient to state a hostile work environment claim because complaint did not provide any details, such as when and how often these incidents occurred, who the speakers were, or what was said).

In arguing the remedial measures were insufficient, Dr. El Chaar completely contradicts his own admissions during the recorded meeting with the Dean in June 2020 in which Dr. El Chaar informed the Dean that his relationships with the faculty had improved substantially and that he and Dr. Warren had come to peace. (A. 2006). Dr. El Chaar explained to Dean Bertolami he only continues to have problems with Dr. Bloom,[12] no one else, and that, "It doesn't matter who is going to come [in as chair], he is always going to find a negative part…that's his nature." (A. 2006-7). Dr. El Chaar did not and cannot present any admissible evidence to suggest that Dr. Bloom said or did anything harassing during the limitations period. (A. 69, 95, 264-267). For Dr. El Chaar to now claim NYU failed to take proper remedial measures is disingenuous.

---

[12] Dr. Bloom was a part-time faculty member and in 2018, Dr. El Chaar removed Dr. Bloom from the perio-clinic, so their interactions were limited at best. (A. 81).

Even if Dr. El Chaar's faculty relationships did not improve, his hostile work environment claim rests on generic allegations of constant harassment, allegations not identified with any precision, and inadmissible hearsay, which is insufficient to avoid summary judgment.[13] *See Quoka v. City of W. Haven*, 64 Fed. Appx. 830, 832 (2d Cir. 2003); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 675-76 (S.D.N.Y. 2012) (granting summary judgment and declining to consider hearsay evidence). During his deposition, Dr. El Chaar testified as follows:

> Q:   … Between the point at which Dr. Sigurdsson took over as chair and your resignation from NYU, did anyone say anything to you that was discriminatory or harassing based on your race or a [*sic*] national origin?
>
> A:   Oh, yeah. Every day I used to – not every day, it was continuously. I hear this guy said something, I told that this guy heard it and he comes to me. That's why I had the meeting with him in July, because the rumors was still around that I am antisemite, every other day…

(A. 293). In support of his claims of conduct within the limitations period, Dr. El Chaar identifies only his testimony relating to instances where other individuals reported to him that they heard someone else say that he was antisemitic (i.e. text messages from Steve Pigliacelli or comments from Dr. Laureen Langer and Burt Langer) [14]. (A. 258-260, 293-295, 310). *See Bright*, 2014 U.S. Dist. LEXIS 155565,

---

[13] Dr. El Chaar's purported PTSD diagnosis is not admissible as evidence of harassment because the psychiatrist has no first-hand knowledge of anything that occurred at the workplace.

[14] The District Court found these comments were based on hearsay but also noted even if the Court were to consider the hearsay statements, El Chaar does not make out a hostile work environment claim. The hearsay statements are too isolated to constitute severe or pervasive conduct in violation of § 1981. (S.P.A.12).

at *21. ("Although though [sic] second-hand knowledge may support a hostile work environment claim, this merry-go-round of hearsay is insufficient to withstand summary judgment unless it stops, at some point, at admissible evidence.").

Without any evidentiary support, Dr. El Chaar also argues NYU leadership failed to take appropriate action to respond to his December 2018 and July 2019 complaints as evidence of a policy permitting discrimination. First, Dr. El Chaar's December 2018 complaint of retaliation relates to an alleged "discrete act of discrimination," namely the failure to promote him as interim chair, and is, therefore, not properly considered as part of the hostile work environment claim. *Murillo-Roman v. Pension Bds.*, No. 1:22-cv-08365 (JLR), 2024 U.S. Dist. LEXIS 12128, at *20 (S.D.N.Y. Jan. 23, 2024); *Maria v. Massachusetts Inst. of Tech.*, No. 1:22-cv-10959 (ALC) (SN), 2024 U.S. Dist. LEXIS 176972, at *44 (S.D.N.Y. Sep. 30, 2024) (alleged non-promotions cannot form the basis for a continuing violation claim); *Johnson v. City of NY*, No. 17-CV-7585 (PKC) (RER), 2019 U.S. Dist. LEXIS 160198, at *15-16 (E.D.N.Y. Sep. 18, 2019) (discrete incidents of discrimination that are unrelated to the hostile work environment cannot be part of a continuing violation and "cannot supply the hook to bring an otherwise untimely hostile work environment claim" into the timely period.) (internal citations omitted). Accordingly, there is no admissible evidence that the allegedly harassing conduct continued after the OEO investigation, and Dr. El Chaar failed to establish any

subsequent conduct was part of the same course of conduct as the Report Acts or were even referenced in the report.

Even if this Court considered the failure to promote Dr. El Chaar as interim chair as part of a policy or practice of discrimination, it is undisputed that (1) OEO requested clarification from Dr. El Chaar as to whether he was advised that he was not eligible for the position or if a decision was made not to fill the position at this time; and (2) Dr. El Chaar responded that the decision was not to fill the position at this time. (A.79). Even if the parties dispute why the OEO did not investigate, Dr. El Chaar's conclusory allegations that this was part of a continuing course of discriminatory conduct to ignore or downplay his complaints is unsupported by the evidence, as detailed at length in Point II(B).

Second, Dr. El Chaar's allegation that NYU's response to the July 2019 letters is part of a pattern and practice of discriminatory conduct is unsupported by the evidence. Dr. El Chaar's reliance on his July 16, 2019 letter in which he vaguely alleges continuing harassment without identifying specific incidents or alleging that his race/national origin was a factor cannot support a hostile work environment claim. It is clear from the face of the letter that Dr. El Chaar was complaining because he felt that his "character and profession" were being attacked, not that he was being mistreated based on his race or national origin. (A. 83). NYU's response to these complaints was sufficient based on the essence of the letter. Indeed, Dr. El

Chaar concedes that in his July 20, 2019 follow up letter to Drs. Schreiber and Sigurdsson, he states, "Thank you for discussing with me my concerns this past Wednesday…" (A. 1504). *See Bright*, 2014 U.S. Dist. LEXIS 155565, at \*24 ("The standard for reviewing the appropriateness of an employer's response to co-worker harassment 'is essentially a negligence one, and reasonableness depends among other things on the gravity of the harassment alleged.'") (internal citations omitted). *See also Bacchus v. NY City Dept. of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) (no evidence of hostile work environment where Plaintiff relies instead on general allegations of hostile behavior and only alleges the hostile behavior "was just as bad as before").

Dr. El Chaar generically alleges NYU failed to remedy the hostile work environment but offers no evidence that the allegedly harassing conduct by the individuals named or identified in the OEO report continued during or after the OEO investigation. In an effort to obfuscate the deficiencies in his claims, Dr. El Chaar identifies irrelevant facts as evidence of his claim that NYU failed to remedy the hostile work environment but disregards salient undisputed facts. Dean Bertolami consulted the OEO investigator who authored the OEO Report and followed the investigator's recommendation that training was the appropriate remedy. (S.P.A. 11; A. 52, 73). Dr. El Chaar notably does not allege that Dean Bertolami, Dean Terracio or Ms. Murphy's conduct caused or contributed to the alleged hostile work

environment or that the training in response to the OEO complaint was inadequate. Instead, he points to irrelevant facts related to Dean Bertolami, Dean Terracio and Ms. Murphy's conduct. Although Dean Terracio never reviewed the OEO report, there is no evidence that he had any responsibility to do so. (A. 73). He was not involved in any discussions within the Department about the OEO's findings and was unaware of the OEO's finding of a hostile work environment. (A.73, 900-901; (S.A. 32). Ms. Murphy also did not "distance" herself from the training; she simply was not responsible for it. OEO led the training sessions, though Ms. Murphy's department (HR) may have assisted in some of the logistical coordination. (A. 712-713). Although Dean Bertolami did not attend the training session organized for the Department faculty, he arranged for the trainings and attended the session for the EMC. (A.74; S.A. 31). The Dean's inability to recall the contents of the 2018 presentations during his deposition in 2023 is irrelevant, as is any allegation that the Dean understood the OEO report to hold Dr. El Chaar partially responsible for the hostile work environment. (S.A. 31). A layman's understanding that Dr. El Chaar contributed to some of the hostility in the Department is not an admission that he believed that Dr. El Chaar was to blame for the hostile work environment harassment as a term of art defined by the policy against discrimination. *See Harris v. S. Huntington Sch. Dist.*, Civ. No. 06-CV-3879 (DGT), 2009 U.S. Dist. LEXIS 27392, at *32 (E.D.N.Y. Mar. 30, 2009) (taking into account whether defendant "attempted

48

to remedy" the conduct in the statute-of-limitations analysis). (S.P.A. 10-11). *See also Russell v. NY Univ.*, 739 F. App'x 28, 30 (2d Cir. 2018) (employer cannot be subject to hostile work environment claim if "employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat [the] offensive conduct.").

Accordingly, because Dr. El Chaar cannot adduce any admissible evidence of harassing conduct within the statute of limitations period, there is no sufficient basis to warrant a finding of policy or practice of harassment.

## B. <u>The District Court Properly Dismissed Dr. El Chaar's Allegations Arising before October 6, 2017 as Time-Barred.</u>

Even if Dr. El Chaar established a policy or practice of harassment because of the alleged misconduct detailed above, Dr. El Chaar relies on untimely and unspecific allegations, involving individuals spanning over a 20-year period, beginning as early as 1995. The District Court properly found that the continuing violation doctrine was inapplicable because Dr. El Chaar's allegations arising outside the statute of limitations period are far too attenuated from his timely allegations to be considered part of a continuing violation[15].

---

[15] The continuing violation doctrine, however, is **heavily disfavored**, as "courts of this Circuit have generally been loath to invoke [it] and will apply it only upon a showing of **compelling circumstances**." *Maria v. Massachusetts Inst. of Tech.*, No. 1:22-cv-10959 (ALC) (SN), 2024 U.S. Dist. LEXIS 176972, at *43 (S.D.N.Y. Sep. 30, 2024) (citing *Little v. NBC*, 210 F. Supp.2d 330, 366 (2d Cir. 2010)) (emphasis added).

Dr. El Chaar alleges colleagues repeatedly called him 'camel-jockey,[16]' and 'terrorist[17]' he was "regularly accused of being anti-Semitic[18] for firing Jewish faculty[19], and favoring 'Arab' students[20]" and Dr. Warren referred Dr. El Chaar as

---

[16] Dr. El Chaar alleges that between 1994 and 1997, more than twenty years before the relevant statute of limitations period, Dr. Davidson sometimes called Plaintiff a "camel-jockey" or an Arab. (A.55). In October 2013, Dr. Davidson allegedly said he would bet 50 cents that Dr. El Chaar will not last a year in his position as Program Director. After Dr. El Chaar confronted Dr. Davidson, he did not make any further negative comments and retired a short time later. (A.60-61, 222-225). *See Ochei v. Mary Manning Walsh Nursing Home Co.*, 2011 US Dist. LEXIS 20542, at *12 (S.D.N.Y. Mar. 1, 2011) ("[your] days are numbered at this place" is considered a facially neutral comment). There is no evidence, admissible or otherwise that any other colleague referred to him as a camel-jockey.

[17] Dr. El Chaar identifies Drs. Chadroff and Schoor referring to him as a terrorist. Dr. El Chaar admitted that Dr. Schoor did not say anything offensive to him after he complained in 2001 and the comment by Dr. Chadroff occurred during a March 2001 ski trip. (A.56, S.A. 24). Dr. El Chaar does not identify any comments referring to him as a terrorist after 2001.

[18] Even if these allegations were not based on inadmissible evidence, Dr. El Chaar testified that calling someone Arab is insulting and is **interchangeable** with being call an antisemite, Muslim. anti-Jew, a dirty Arab, terrorist and a criminal. (A. 95). A reference to someone's national origin is not, in and of itself, racist. *See Chudnovsky v. Prudential Sec. Inc.*, 2000 U.S. Dist. LEXIS 15401, at *23 (S.D.N.Y. Oct. 13, 2000) (Statements acknowledging plaintiff's national origin and background do not support discriminatory animus.).

[19] In support of these allegations, Dr. El Chaar claims Dr. Warren accused him of being anti-Semitic and firing Jewish faculty. The statement is not supported by admissible evidence. Dr. El Chaar's "fact" is based on his following testimony: "[Dr. Warren] tells Alan Pernikoff that I did not accept him because he is a Jew. I don't think that there's more than that to prove that he is – he considered me that I'm an antisemitic…When Dennis Tarnow that was fired by Bertolami meet me in one of the meetings, and he tells me that Roger Warren told him that I am fighting all the Jewish and I am an antisemite…" (A. 229; S.A. 26). This testimony is not based on first-hand knowledge and is inadmissible hearsay. In October 2018, Dr. Horowitz, allegedly stated at a conference that the faculty had destroyed the Program, which Dr. El Chaar interpreted as an insult to him as Program Director. (A. 81). Dr. El Chaar **speculated** that Dr. Horowitz made these comments because he believed Dr. El Chaar was antisemitic for removing only Jewish faculty members from the clinic. (A. 82). But he did not identify any evidence to support his conclusion, and, even if he had, Dr. Horowitz's good-faith allegation that Dr. El Chaar engaged in discriminatory conduct cannot in and of itself constitute discriminatory harassment against Dr. El Chaar.

[20] In July 2015, an anonymous letter was distributed alleging that Dr. El Chaar was having an affair

Hitler and told people he had a plaque that said "Fuhrer."[21] (App. Br. 39). Regardless, Dr. El Chaar admitted that the offensive comments made to him prior to 2001 were sporadic and alleged that by June 2020, his relationship with the faculty was positive (A. 55, 2006). Even if Dr. El Chaar had offered some proof that any conduct was motivated by racial animus, the conduct he complains of was too isolated and limited in duration to establish an objectively hostile work environment. *Monterosso v. Sullivan & Cromwell*, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (co-worker referred to plaintiff as 'stupid Italian' on several occasions held insufficient to support a hostile work environment claim).

Even if Dr. El Cahaar could proffer admissible evidence of harassing conduct during the limitations period, which he cannot, he cannot rely on conduct that occurred prior to his break in service from June 2012-August 2013. *See Palmer v. Cook*, 65 Misc. 3d 374, 384 (Sup Ct, Queens County 2019) (no continuing violation from alleged misconduct that occurred during first period of employment because it was too attenuated from conduct that occurred during second period of employment to be deemed in furtherance of policy of discrimination).

---

with a student and favoring Arab students. (A.65). An investigation was conducted and found nothing inappropriate had occurred. (A.65).

[21] The 2016 allegation that Dr. Warren referred to Dr. El Chaar as Hitler is hearsay based solely on Dr. El Chaar's testimony: "I got a phone call, and I cannot remember her name now…Anyhow, she called me on my cell phone…and she told me 'be careful, I was with faculty today, and they were calling you Hitler because you are getting rid of the Jewish faculty' That's how I heard it…" (A. 247; S.A. 27).

There is no disputed issue of fact to submit to a jury because Dr. El Chaar cannot adduce any timely, admissible evidence of harassment, and, even if considered, the time-barred evidence is insufficient to support a finding that the conduct was sufficiently severe or pervasive to alter the conditions of Dr. El Chaar's employment.

## CONCLUSION

For the foregoing reasons, the District Court properly granted summary judgment dismissing Dr. El Chaar's causes of action under §1981. Defendant-Appellee respectfully requests that the District Court's decision be affirmed and Dr. El Chaar's appeal be dismissed.

Respectfully submitted,

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
914-872-8060

By: _____

Susan D. Friedfel
Poonam Sethi
*ATTORNEYS FOR*
*DEFENDANT-APPELLEE*

Dated:     October 30, 2024
           White Plains, New York

52

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Susan D. Friedfel, attorney of record for Defendant-Appellee, hereby certifies that the preceding brief complies with the type volume limitation set forth in Local Rule 32.1(a)(4)(A). This brief is in 14-point Times New Roman font. The total number of words in the brief, based upon the word count of the word-processing system used to prepare the brief is 13,760.

_____
Susan D. Friedfel